PENNOYER and another vs. ALLEN and another.

*December 14, 1882 — January 9, 1883.*

NUISANCE.  *(1, 2) Proximity of offensive business to dwellings: Proper conduct of business, as defense.  (3) Positive and negative testimony as to odors.*

1. The question of nuisance from the maintenance of any business depends not only upon the character of such business, but also upon its proximity to the dwellings, business, property, or occupancy of others.
2. Any business, though in itself lawful, which necessarily and constantly impregnates large volumes of the atmosphere with dis-

agreeable, unwholesome or offensive matter, may become a nuisance to those occupying adjacent property, in case it is so near, and the atmosphere is contaminated to such an extent, as to substantially impair the comfort or enjoyment of such adjacent occupants. In such case it is no defense that the business was conducted in a reasonable and proper manner and with more than ordinary cleanliness, and that the odors sent over and upon the adjacent premises were only such as were incident to the business when properly conducted.

3. The question being as to the presence and character of odors upon the plaintiffs' premises, it was error to refuse to instruct the jury that "the rule of law is that the positive testimony of one credible witness to a fact is entitled to more weight than the testimony of several witnesses who testify negatively or to collateral circumstances, merely persuasive in their character, from which a negative may be inferred."

APPEAL from the Circuit Court for *Kenosha* County.

The case is thus stated by Mr. Justice Cassoday:

" This is an action to recover damages accruing to the plaintiffs between September 11, 1873, and January 1, 1878, by reason of the maintenance of a tannery, alleged to have been a nuisance, by the defendants, adjacent to the water-cure establishment of the plaintiffs in Kenosha, and for the abatement of such nuisance. The answer, among other things, set up a prior action by one of the plaintiffs against one of the defendants, and the settlement thereof, September 24, 1867, whereby such plaintiff, by release under seal, discontinued such action without costs, and acknowledged satisfaction and discharge of the damages claimed in the complaint, and thereby confirmed to the defendant therein, his heirs and assigns, the rights claimed in the answer on file therein. The answer also set up ten years, and twenty years, adverse user, under claim of title to the lots upon which the tannery stood, exclusive of any other right. The answer also set up, by way of equitable counterclaim, the investment of large amounts of money in the construction of buildings and improvements for the tannery business upon

their lots, and such adverse user, and demanded judgment, that, as against the plaintiffs, or either of them, and all persons claiming under them, they should have the absolute right to keep and maintain their tannery, and prosecute their business, and send over and upon the premises of the plaintiffs, odors, vapors, smoke, and soot from the said tannery, and necessarily arising from the operation of such tannery. The plaintiffs demurred to the counterclaim, and such demurrer was sustained by this court (50 Wis., 308), whereupon the cause was tried by the court and a jury, who, at the close of the trial, under the instructions of the court, returned a special verdict for the defendants as follows:

" '1. Have the defendants frequently, between the 11th day of September, 1873, and the 1st day of August, 1878, by the operation of their tannery and the business connected therewith, sent over and upon the premises of the plaintiffs disagreeable and offensive odors, to such an extent as to materially interfere with their comfortable enjoyment of the said premises? *Answer.* No.

" '2. Has the business of the plaintiffs, in their water-cure establishment, been injured between the 11th day of September, 1873, and the 1st day of January, 1878, by reason of disagreeable and offensive odors proceeding from the tannery of defendants? *A.* No.

" '4. Has the rental value of the plaintiffs' premises between September 11, 1873, and January 1, 1878, been affected by reason of disagreeable and offensive odors proceeding from defendants' tannery, and, if so, state how much and to what extent has it been affected? *A.* No.

" '6. Did the defendants, between the 11th day of September, 1873, and the 1st day of January, 1878, materially enlarge the tannery and substantially increase the business conducted therein? *A.* Yes.

" '7. Did the defendants, from the 11th day of September, 1873, to the 1st day of January, 1878, operate their tannery

-and the business connected therewith in a reasonable and proper manner?  *A.* Yes.

"'8. Did the defendants, from the 11th day of September, 1873, to the 1st day of January, 1878, in the operation of their tannery and the business connected therewith, send over and upon the premises of the plaintiffs any odors other than such as are incident to a tannery properly conducted?  *A.* No.

"'9. Did the defendants, between the 11th day of September, 1873, and the 1st day of January, 1878, in the operation of their tannery and the business connected therewith, send over and upon the plaintiffs' premises offensive odors of such character and to such a degree as to substantially impair the uses and enjoyment of such premises to the plaintiffs and their families?  *A.* No.

"'10. How long has the tannery of the defendants been established and operated?  *A.* About twenty-four years.

"'11. Have the plaintiffs known of the enlargements of the tannery which have been made from time to time since the plaintiffs, or either of them, became interested in the water-cure, at the times such enlargements were made?  *A.* They did know and did not object.

"'12. Have the plaintiffs, or either of them, made objections to the defendants, or either of them, to any of the enlargements of the tannery, apart from the suit brought in 1866?  *A.* No.

"'13. Did the defendants, between September 11, 1873, and January 1, 1878, render fleshings and refuse from hides on the tannery premises?  *A.* No.

"'14. Do you find for the plaintiffs or for the defendants?  *A.* Defendants.'

"The plaintiffs objected to the seventh, eighth, tenth, eleventh, twelfth, thirteenth and fourteenth questions, and excepted to the submission thereof to the jury.

"Thereupon, and at the same term, the plaintiffs' counsel

moved, upon the minutes of the court, to set aside the verdict and for a new trial, on the grounds that the verdict was against the law and the evidence, and that the judge erred in refusing the instructions asked by the plaintiffs, which motion was denied by the court, and the counsel for the plaintiffs then and there duly excepted. Thereupon judgment upon said verdict in favor of the defendants and against the plaintiffs was rendered for the costs of the action, from which judgment and the whole thereof the plaintiffs bring this appeal."

*J. V. Quarles*, as attorney, and *John T. Fish*, of counsel, for the appellants, to the point that it was immaterial whether or not the defendants' tannery was kept in as cleanly a manner as similar establishments usually are, cited: Wood on Nuisance, 506; Hilliard on Torts, 639; *Aldrich v. Howard*, 8 R. I., 246; *Shiras v. Olinger*, 50 Iowa, 571; *S. C.*, 32 Am. Rep., 141, and note; *Fish v. Dodge*, 4 Denio, 311; *Fertilizing Co. v. Hyde Park*, 97 U. S., 659.

For the respondents there was a brief by *James Cavanagh*, as attorney, and *Quarles & Stebbins*, of counsel, and oral argument by *Charles Quarles* and *F. C. Winkler*.

CASSODAY, J. The order sustaining the demurrer to the equitable counterclaim was affirmed by this court in 50 Wis., 308, for the reasons there given. A similar ruling was made in a similar action in favor of the same plaintiffs, and against these defendants *and another*, in 51 Wis., 360, for the reasons there given. We do not think that the settlement of September 24, 1867, is a bar to this action, especially as the defendants have since that time, as shown by the undisputed evidence, and, in effect, found by the jury, made several enlargements to their tannery, and each in the direction of the water-cure in question. The court allowed evidence to be given upon the part of the defendants, against the objection of the plaintiffs, tending to show that the tannery was

kept by the defendants more than ordinarily clean,—cleaner than an average of tanneries. As bearing upon that question, the court was requested to instruct the jury that "the fact that a business is a lawful one, and that it is conducted in the best possible manner, will not prevent it from being a nuisance." This instruction was refused by the court, and the plaintiffs excepted. And then the court, against objection on the part of the plaintiffs, submitted to the jury, in effect, whether the defendants during the time in question operated their tannery, and the business connected therewith, in a reasonable and proper manner, and whether in such operation any odors, other than such as were incident to a tannery properly conducted, were sent over and upon the premises of the plaintiffs. The first of these questions was answered by the jury in the affirmative, and the second in the negative. These rulings can only be sustained upon the theory that a tannery doing the amount of business of the defendants, operated in a reasonable and proper manner, and sending forth no odors, except such as are incident to such a tannery properly conducted, cannot be a nuisance to the owner and occupant of adjacent premises used as a water-cure like the one in question. Is such the law?

In *Walter v. Selfe*, 4 De G. &. S., 315, a brick-kiln on premises adjacent to the plaintiffs was held to be a private nuisance, and in deciding the case the learned Vice-Chancellor KNIGHT BRUCE took occasion to say that he had no doubt, upon the facts and the law, that the plaintiffs, as owners and occupiers of the house, offices, and garden, were "entitled to an untainted and unpolluted stream of air for the necessary supply and reasonable use of himself and his family there; or, in other words, to have there, for the ordinary purposes of breath and life, an unpolluted and untainted atmosphere; . . . meaning by untainted and unpolluted, not necessarily air as fresh, free and pure as at the time of building the plaintiffs' house, . . . but air not rendered to an im-

portant degree less compatible, or, at least, not rendered incompatible, with the physical comfort of human existence — a phrase to be understood, of course, with reference to the climate and habits of England." That decision was affirmed on appeal by Lord St. Leonards (id., 326), and subsequently approved in *Pollock v. Lester*, 11 Hare, 266, and followed in the Exchequer Chamber in *Bamford v. Turnley*, 3 Best & S., 62.

In this last case the trial court "directed the jury . . . to find for the defendant, notwithstanding his burning the brick had interfered with the plaintiff's comfort, if they were of opinion that the spot where the bricks were burnt *was a proper and convenient spot*, and the burning of them was, under the circumstances, a reasonable use by the defendant of his own land." This direction was held to be erroneous, and the verdict for the defendant was set aside. In giving the opinion of the court it was observed that the direction was plainly founded on a passage in Comyn's Digest, for which no authority had been cited, and that there was a want of precision, especially in the words "reasonable and convenient," which rendered its meaning by no means clear. The court added: "Does this expression mean, as the court understood it in that case, that the place is proper and convenient for the purpose of carrying on the trade, or does it mean that it is a place where a nuisance will not be caused to another?" The court then quotes approvingly this sentence: "A tan-house is necessary, for all men wear shoes, and nevertheless it may be pulled down if it be erected to the nuisance of another; in like manner of a glass-house; and they ought to be erected in places convenient for them." The opinion continues: "The term appears to be used in the same sense when applied to questions as to public nuisances. Thus it is said in Hawkins: . . . 'It seems to be agreed that a brew-house, erected in such an inconvenient place wherein the business cannot be carried on without greatly incommoding the neigh-

borhood, may be indicted as a common nuisance.' It would seem, therefore, that just as the use of an offensive trade will be indictable as a public nuisance if it be carried on in an inconvenient place, *i. e.*, a place where it greatly incommodes a multitude of persons, so it will be actionable as a private nuisance if it be carried on in an inconvenient place, *i. e., a place where it greatly incommodes an individual.* If this be the true construction of the expression ' convenient,' in the passage from Comyn's Digest, the doctrine contained in it amounts to no more than what has long been settled law, viz.: that a man may, without being liable to an action, exercise a lawful trade, as that of a butcher, or brewer, and the like, notwithstanding it be carried on so near the house of another as to be an annoyance to him, in rendering his residence there less delectable or agreeable, provided the trade be so conducted that it does not cause what amounts, in point of law, to a nuisance to the neighboring house." The court then observed that the introduction into the law of England of the doctrine that a place may be proper and convenient for the carrying on of a trade, notwithstanding it is a place where the trade cannot be carried on without causing a nuisance to a neighbor, " would, we think, lead to great inconvenience and hardship, because,  .  .  .  if the doctrine is to be maintained at all, it must be maintained to the extent that, however ruinous may be the amount of nuisance caused to a neighbor's property by carrying on an offensive trade, he is without redress if a jury shall deem it right to find that the place where the trade is carried on is a proper and convenient place for the purpose." The same doctrine was sanctioned by the House of Lords in *St. Helen's Smelting Co. v. Tipping*, 11 H. L. Cas., 642. See, also, *Gaunt v. Fynney*, 4 Moak's Eng. R., 718; *Benjamin v. Storr*, 10 id., 231.

In *Rex v. White*, 1 Burr., 333, it was held that "it is a common nuisance to make acid spirit of sulphur, and thereby impregnate the air with noisome stinks." In that case Lord

MANSFIELD observed, that "it is not necessary that the smell should be unwholesome; it is enough if it renders the enjoyment of life and property uncomfortable."

In *Aldrich v. Howard*, 8 R. I., 246, it was held that "a livery stable might be a nuisance, notwithstanding it may be an admitted fact that it was well and properly built, in a location as unobjectionable as would be any in the town or city, and is properly kept and managed. And evidence tending to show that other stables similarly situated do not create serious annoyance to neighboring householders may properly be excluded as irrelevant."

In *Commonwealth v. Upton*, 6 Gray, 473, a slaughterhouse was condemned as a nuisance, and the court held that "carrying on an offensive trade for twenty years, in a place remote from buildings and public roads, does not entitle the owner to continue it in the same place after houses have been built and roads laid out in the neighborhood, to the occupants of and travelers upon which it is a nuisance." The same court held substantially the same way in respect to refining petroleum under a statutory right. *Commonwealth v. Kidder*, 107 Mass., 188. A similar ruling was made in *Pottstown Gas Co. v. Murphy*, 39 Pa. St., 257; *Savile v. Kilner*, 20 Law T., 277.

In *Rex v. Pappineau*, 2 Strange, 686, the indictment was sustained because the tannery was alleged to be near the highway and also near several dwelling-houses. *Bliss v. Hall*, 4 Bing. N. C., 183.

In *Francis v. Schoellkopf*, 53 N. Y., 152, the plaintiff was deprived of the rental of her two houses by reason of the stench arising from the defendant's tannery, and it was held that she could recover, notwithstanding others having property in the vicinity were also injured. These authorities are sufficient to show that the cause was submitted to the jury upon the wrong theory. Many others might be added, but it is unnecessary. Of course the law is not so rigid as to

make every business which imparts any degree of impurity to the atmosphere a nuisance. The law is practical as well as just. The maintenance of life and business, especially in crowded cities, necessitates the imparting of a certain degree of impurity to the atmosphere. The law gives protection only against substantial injury. To be of legal cognizance, the injury must be tangible, or the discomfort perceptible to the senses of ordinary people. Undoubtedly a party has the unlimited and unqualified right to use his property as he pleases, provided he does not so use it as to become a nuisance to others. Such rights, duties, and obligations between the respective owners of adjacent lands are necessarily reciprocal. Persons owning lands and operating a tannery thereon in some unfrequented place, so remote from other dwellings and property, and places where people are accustomed to pass or be, as not to annoy or discomfort any one else, nor impair the use of other property, would not be liable for maintaining a nuisance, however unclean and filthy their tannery might become, and however unreasonably and improperly it might be operated. It is because a person maintains something that annoys or incommodes another or his business — something noxious or offensive to another — that such right of action is given. The question of nuisance, therefore, depends not only upon the character of the business maintained, but its proximity to the dwellings, business, property, or occupancy of others.

The ownership of land carries with it the rightful use of the atmosphere while passing over it. Title to land gives to the owner the right to impregnate the air upon and over the same with such smoke, vapor, and smells as he desires, provided he does not contaminate the atmosphere to such an extent as to substantially interfere with the comfort or enjoyment of others, or impair the use of their property. But air is movable, and constantly flowing from the premises of one to those of another, and hence, when it becomes thickly

impregnated with putrid substances, it necessarily flows onto the adjacent premises in one direction or another. This being so, it follows that any business which necessarily and constantly impregnates large volumes of the atmosphere with disagreeable, unwholesome, or offensive matter, may become a nuisance to those occupying adjacent property, in case it is so near, and the atmosphere is contaminated to such an extent, as to substantially impair the comfort or enjoyment of such adjacent occupants. When such comfort and enjoyment are so impaired, and compensation is demanded, it is no defense to show that such business was conducted in a reasonable and proper manner, and with more than ordinary cleanliness, and that the odors so sent over and upon such adjacent premises were only such as were incident to the business when properly conducted. It is the interruption of such enjoyment and the destruction of such comfort that furnishes the ground of action, and it is no satisfaction to the injured party to be informed that it might have been done with more aggravation. The business is lawful; but such interruption and destruction is an invasion of private rights, and to that extent unlawful. It is not so much the manner of doing as the proximity of such a business to the adjacent occupant which causes the annoyance. A business necessarily contaminating the atmosphere to the extent indicated should be located where it will not necessarily deprive others of the enjoyment of their property, or lessen their comfort while occupying the same.

The manner of submitting this case to the jury, as above indicated, had a direct tendency, as we think, to mislead the jury, and hence the rulings mentioned must be regarded as erroneous. The court was requested, but refused, to charge the jury that " the rule of law is that the positive testimony of one credible witness to a fact is entitled to more weight than the testimony of several witnesses who testify negatively, or to collateral circumstances, merely persuasive in

their character, from which a negative may be inferred." The correctness of the proposition cannot be doubted. *Ralph v. C. & N. W. Railway Co.*, 32 Wis., 177; *Bierbach v. Goodyear Rubber Co.*, 54 Wis., 213. The only question in regard to the propriety of giving it is whether it was applicable. The case was not one where all the witnesses on both sides having equal knowledge were testifying to the existence or non-existence of the same fact occurring at the same time and place, and hence does not come within the exception to the rule given in *Sobey v. Thomas*, 39 Wis., 317, nor does it come within the exception given in *Berg v. C., M. & St. P. Railway Co.*, 50 Wis., 419. The presence and character of the odor at the water-cure would necessarily depend much upon the extent and direction of the wind and other circumstances. The evidence covers several years. It is quite apparent that the absence of such odors at any particular time and under particular circumstances, and when the wind was in a particular direction, would not disprove the presence of such odors at some other time, under other circumstances, and when the wind was in a different direction. This being so, the instruction was applicable and should have been given. It may be that the giving of it would have made it proper to have given still further instruction, but that did not justify its refusal. Assuming, as claimed, that there were still other errors in improperly submitting or failing to submit the case to the jury, yet it is enough to say that they may not occur upon another trial.

*By the Court.*— The judgment of the circuit court is reversed, and the cause is remanded for a new trial.