CITY OF MILWAUKEE, Respondent, vs. MILBREW, INC., Appellant.

*March 10—June 1, 1942.*

528

*William F. Quick* and *E. Ace Bernstein,* both of Milwaukee, for the appellant.

For the respondent there were briefs by *Walter J. Mattison,* city attorney, and *Mathias Schimenz* and *Arthur S. Ehrmann,* assistant city attorneys, and oral argument by *Mr. Schimenz* and *Mr. Ehrmann.*

The following opinion was filed April 7, 1942:

FAIRCHILD, J. Whether a nuisance exists and what remedies are provided for dealing with an existing nuisance raise questions which involve technical propositions of law and matters of public policy. It was said in *Gilbert v. Showerman* (1871), 23 Mich. 448, 456, a suit seeking to enjoin the operation of a mill as a private nuisance, that: "We cannot shut our eyes to the obvious truth that if the running of this mill can be enjoined, almost any manufactory in any of our cities can be enjoined upon similar reasons. Some resident must be incommoded or annoyed by almost any of them. In the heaviest business quarters and among the most offensive trades of every city, will be found persons who, from motives of convenience, economy, or necessity, have taken up there their abode; but in the administration of equitable police, the greater and more general interests must be regarded rather than the inferior and special. The welfare of the community cannot be otherwise subserved and its necessities provided for."

That some one is annoyed by what to him is a disagreeable smell or noise is not in and of itself such evidence of a nuisance as to warrant a prosecution under an ordinance reading as do the ones here involved. The existence of a nuisance depends upon whether there is physical injury to property or occupant resulting from a use, and a municipality's interest is aroused only when the injury is substantial, the facts are weighty and important, and the public is affected. The fundamental rule, while usually stated in terms of limitation, comprehends qualifications affording necessary protection. The difficulty in defining what constitutes a nuisance so that each case as it arises can be accurately tested has not been done away with, but it may be said that a prosecution under a city ordinance ought not result in a verdict of guilty if the result is to single out a particular use by an industry as objectionable without a showing that it is detrimental or prejudicial to public health or welfare by clear and convincing evidence. The rights that may come within the court's consideration may vary from comfortable enjoyment of property to protection against a condition

dangerous to health; but the judgment must be framed in a procedure affected by the municipal legislation as well as the common law.

There is no contention that the use to which this factory is being put, namely, for drying brewers' yeast, is unlawful, and from the evidence as it is before us the location of the business is within a zone set apart for manufacturing. The only ordinances of the city which are in evidence are sections 871 and 875 of the Milwaukee Code, 1914, and when properly construed these ordinances do not outlaw the use to which appellant is devoting its property. There is no question raised as to the general power of the city to enact ordinances of the nature of those upon which the city relies for a conviction in this case, and we assume that ample authority to regulate public nuisances may be found in the general-welfare clause of the city charter.[1]  3 McQuillin, Mun. Corp. (2d ed. 1928) pp. 106, 120, §§ 950, 954; 2 Dillon, Mun. Corp. (5th ed. 1911) pp. 1043, 1044, § 689; *Dallmann v. Kluchesky* (1938), 229 Wis. 169, 282 N. W. 9; *Walker v. Towle* (1901), 156 Ind. 639, 59 N. E. 20, 53 L. R. A. 749. Such regulation comes within a well-recognized field of municipal control. 3 McQuillin, Mun. Corp. p. 119 *et seq.*, §§ 954–956, incl.; 2 Dillon, Mun. Corp. p. 1043 *et seq.*, §§ 684–689; Parker and Worthington, Public Health and Safety (1892), pp. 55, 56, § 44.

Preliminary to a consideration of the specific violation complained of under the ordinance, it is important to bear in mind certain fundamental propositions underlying the right of a municipality to exercise such power. First, ordinances of this nature, as any other exercise of the police power, are subject to the safeguards and guaranties of the state and federal

---

[1] Under sec. 66.05 (7), Stats., the city is given express authority to "direct the location, management and construction of, and license, . . . regulate or prohibit any industry, thing or place where any nauseous, offensive or unwholesome business may be carried on, within the city. . . . Any such business conducted in violation of any . . . ordinance permitted to be enacted under the provisions of this subsection is declared to be a public nuisance. . . ."

constitutions. *Dobbins v. Los Angeles* (1904), 195 U. S. 223, 25 Sup. Ct. 18, 49 L. Ed. 169; *Maercker v. Milwaukee* (1912), 151 Wis. 324, 139 N. W. 199, L. R. A. 1915 F, 1196, Ann. Cas. 1914 B, 199; 3 McQuillin, Mun. Corp. pp. 117, 118, § 953; 37 Am. Jur. p. 919, § 285. Second, it is only a *public* nuisance that may be punished by a municipality in the exercise of its police powers. *City of McAlester v. Grand Union Tea Co.* (1940) 186 Okla. 487, 98 Pac. (2d) 924. Third, a municipality, in general, has no power to declare that to be a nuisance which is not so in fact. 3 McQuillin, Mun. Corp. pp. 125, 126, § 956. In holding invalid an ordinance of the city of Milwaukee declaring a certain wharf to be a nuisance contrary to the fact, the United States supreme court declared: "It is a doctrine not to be tolerated in this country, that a municipal corporation, without any general laws either of the city or of the state, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property of the city, at the uncontrolled will of the temporary local authorities." *Yates v. Milwaukee* (1870), 10 Wall. (77 U. S.) 497, 505, 19 L. Ed. 984.

The classification of public nuisances as drawn by the Illinois court in the case of *The People v. City of Chicago* (1913), 260 Ill. 150, 152, 102 N. E. 1039, furnishes the base upon which to examine the scope and validity of the ordinances here in question:

"Nuisances may be divided into three classes: First, those which in their nature are nuisances *per se* or are so denounced by the common law or the statute; second, those which in their nature are not nuisances but may become so by reason of their locality, surroundings or the manner in which they may be conducted or managed; and third, those which in their nature may be nuisances but as to which there may be honest differences of opinion in impartial minds. The power granted to cities in relation to nuisances authorizes the city council to declare those things falling within the first and third classes

to be nuisances, but as to those things falling within the second class the only power the city has is to declare such of them to be nuisances as are so in fact."

The nuisance here claimed to exist is not one arising from the operation of a specific business or the commission of a specific act condemned as such by statute or ordinance, such as disorderly houses, *Ogden v. Madison* (1901), 111 Wis. 413, 87 N. W. 568, 55 L. R. A. 506; gambling devices, *Dallmann v. Kluchesky, supra;* or keeping of more than two dogs within a residential district, *State v. Mueller* (1936), 220 Wis. 435, 265 N. W. 103. Neither is it a nuisance *per se* within the common law, a class defined by Wood as "those intangible injuries which affect the morality of mankind, and are in derogation of public morals and public decency," 1 Wood, Nuisances (3d ed. 1893), p. 46, § 23, and by some courts as an act, occupation, or thing that is a nuisance at all times and under any conditions, 39 Am. Jur. p. 289, § 11. But the doctrine of nuisances *per se* is a limited one, 2 Wood, Nuisances, pp. 764, 765, § 569, and with the increase in trade and manufacturing the early theory of nuisances *per se* as applied to a business has given way to the view that a trade or manufacture becomes a nuisance only in relation to its surroundings, 2 Wood, Nuisances, pp. 765, 766, § 570.

Foul and offensive odors have long been recognized by the common law as constituting a public nuisance. 2 Wood, Nuisances, p. 819, § 609; but this form of nuisance arising from the proper conduct of a lawful business must, as a general matter, be tested in respect to the location where the business is being conducted. This doctrine was stated by Mr. Justice CASSODAY in the case of *Pennoyer v. Allen* (1883), 56 Wis. 502, 510, 511, 14 N. W. 609, in the following language:

"Of course the law is not so rigid as to make every business which imparts any degree of impurity to the atmosphere a nuisance. The law is practical as well as just. The maintenance of life and business, especially in crowded cities, necessitates

the imparting of a certain degree of impurity to the atmosphere. The law gives protection only against substantial injury. To be of legal cognizance, the injury must be tangible, or the discomfort perceptible to the senses of ordinary people. Undoubtedly a party has the unlimited and unqualified right to use his property as he pleases, provided he does not so use it as to become a nuisance to others. . . . The question of nuisance, therefore, depends not only upon the character of the business maintained, but its proximity to the dwellings, business, property, or occupancy of others."

A municipality is not helpless in the matter of excluding objectionable and nuisance-creating businesses but all of a kind must be treated with the same degree of fairness. In this case we have a business located in a section of the city that has been set apart as a manufacturing district, no charge has been made by the city that the industry in question was not within the proper zone or area. There is no finding that defendant is negligent in any respect in operating or caring for its premises, so the only portion of the ordinance involved is that reading "or which shall emit foul or offensive odors, gases, effluvia or stenches, or which shall be dangerous or prejudicial to the public health, is hereby declared to be a public nuisance."

The evidence is to the effect that the defendant's business is objectionable to certain persons who were witnesses for the prosecution, but that its operation is of such a nature as to deprive a normal person living in the neighborhood of the comforts of home so that it may be said the public welfare is invaded is not established by a preponderance of the testimony.

A brief summary of the typical testimony of different witnesses produced by plaintiff will serve to emphasize the point that such a general positive discomfort does not exist as a result of defendant's operation of its plant as can amount to a public offense.

Augusta Wenzel testified to having considerable discomfort, inability to eat, and that the odor had not improved since spring. She had been under a doctor's care before and

after defendant's plant started operation. She said: "Last winter I had an infection and in April 18th I was operated for a broken spine and I never mentioned this odor to my doctor. If you're sick and come from the hospital you vomit. I had to vomit. I did not have to vomit on any days that I didn't smell the odor." On cross-examination she testified: "I vomited four or five times the first four days I came from the hospital. I have not vomited since."

Some twenty witnesses supported the complaint and an equal or greater number similarly situated testified as did Joseph Poliak who worked one hundred feet southwest of the defendant's plant: "I have smelled the odor. . . . It has no reflection on me; it has not affected my health, is not offensive or objectionable in any form." When we turn to the testimony of the doctors and chemists, we find evidence of similar import. Dr. Burkhardt, city deputy health commissioner, said: "Practically all individuals are sensitive to some types of things, whether they be odors or what have you. Many individuals may like a certain odor, which is entirely repugnant to others. . . . Those of us in the public health field can list any number of individual instances where types of odors have been disagreeable enough to affect on a neurological basis the health of individuals." "Q. That would have the same effect on the nerves as the noise from streetcars? A. Streetcars, I suppose, can have the same effect, yes."

John W. Russert, brewmaster, a graduate of the Seidel Institute of Technology, testified: "There is practically no odor there now. I was there within ten days or two weeks. There is nothing hurtful, painful, harmful, pernicious, or destructive in that odor. It was very slightly ill-smelling. There was nothing rotten, loathsome, or disgusting about it. The only way I could describe that odor would be that it is a beery odor similar to the odor you might get from a brewhouse."

There is no evidence of a tendency on the part of residents to move from the neighborhood, although a number who find

the odor objectionable do not own the property where they live and work at a distance from that neighborhood. One witness who complains of the smell had recently moved nearer to the plant.

The regulation provided by the only city ordinances produced at the trial and under the evidence here before us has not been transgressed. The case of *Terrell v. Wright* (1908), 87 Ark. 213, 216, 112 S. W. 211, 19 L. R. A. (N. S.) 174, although relating to a private nuisance is somewhat analogous. It is there said:

"Numerous witnesses testified, with evident sincerity and conviction, that the noises were of such a persistent and unpleasant nature as to bring positive discomfort to persons living in homes situated as those of the plaintiffs, and to material discomfort and inconvenience from smoke and cinders, and, in short, testified to facts which, if the true situation as felt by the normal person, would render a home situated as those of the plaintiffs uncomfortable and unbearable by reason of the noise and soot and smoke, thereby entitling the plaintiffs to their injunction. On the other hand were as many or more witnesses, apparently of equal sincerity and conviction, who testified that the noise and smoke and cinders would not be more than a mere inconvenience or trivial annoyance, at most, which is too slight a cause for the law to make the basis for abating a useful business."

The trial judge expressed himself as being rather strongly of opinion that a civil action to abate a nuisance would be more likely to bring a satisfactory result than a "criminal action." The findings in the case are contained in the decision at the close of the testimony where it is said: "This factory I find is operated so that it was at the time charged in the complaint noxious." The court then refers, in relation to the offensiveness of the smell, to the testimony of witnesses variously describing the character of the smell as being of a quality ranging from "sickening" to "stinking." The court found, however, that the odor is not "dangerous" to health. But it is

suggested that there may be a condition "prejudicial to the public health," on the theory, we imagine, as suggested by Dr. Burkhardt, that any thing that worries or bothers one may be prejudicial to health. It was also said below that: "Some witnesses have indicated that they have been affected and the odors were very disagreeable, and others, quite as truthful, have testified that they didn't notice the odors. That in itself isn't necessarily a conflict on the matter of veracity. That's the constitution of the different individuals."

As we read the evidence and the decision of the trial court, it appears that the only odor emanating from defendant's plant is that of dried yeast, and this odor is complained of by some and considered unobjectionable by others. Under the findings and the facts in the record the judgment must be for defendant and the complaint dismissed.

The word "offensive," as defined in Webster's New International Dictionary (2d ed.), means "giving pain or unpleasant sensations," "revolting," or "obnoxious." To construe this ordinance as attempting to condemn as "offensive" any odor that is merely disagreeable to, or disliked by, an indefinite number of persons in a given neighborhood would render the legislation void as too vague and indefinite for enforcement. *State v. Clarke* (1897), 69 Conn. 371, 37 Atl. 975, 61 Am. St. Rep. 45, 39 L. R. A. 670; *Ex parte Westellison* (1927), 38 Okla. Cr. 207, 259 Pac. 873; *Oregon Box & Mfg. Co. v. Jones Lumber Co.* (1926) 117 Or. 411, 244 Pac. 313; or would turn the question of the existence of a nuisance into a plebiscite of the neighborhood and amount to an unlawful delegation of authority. *State ex rel. Nehrbass v. Harper* (1916), 162 Wis. 589, 593, 594, 156 N. W. 941; *Wasilewski v. Biedrzycki* (1923), 180 Wis. 633, 638, 639, 192 N. W. 989; *La Crosse v. Elbertson* (1931), 205 Wis. 207, 213, 237 N. W. 99.

The ordinance must be given a reasonable construction to carry out its purpose, *C. Beck Co. v. Milwaukee* (1909), 139

Wis. 340, 349, 120 N. W. 293, 131 Am. St. Rep. 1061; *State ex rel. Milwaukee v. Milwaukee E. R. & L. Co.* (1911) 144 Wis. 386, 398, 129 N. W. 623; and the word "offensive" should be interpreted in the light of the more particular words characterizing the odor, *State ex rel. Schmidtkunz v. Webb* (1939), 230 Wis. 390, 400, 284 N. W. 6.

It is considered that the evidence presented does not sustain a conviction under the ordinance.

*By the Court.*—Judgment reversed, and cause remanded with directions to dismiss the complaint.

A motion for a rehearing was denied, with $25 costs, on June 1, 1942.