**CITY OF EAGLE GROVE,**
Iowa, Appellant,

v.

**CAHALAN INVESTMENTS,**
LLC, Appellee.

No. 16-1658

Supreme Court of Iowa.

Filed December 1, 2017

Lynn Collins Seaba of Malloy Law Firm, LLP, Goldfield, for appellant.

Eric J. Eide of The Law Office of Eric J. Eide, P.L.C., Fort Dodge, for appellee.

HECHT, Justice.

The City of Eagle Grove (City) filed petitions alleging two properties owned by Cahalan Investments, LLC (Cahalan) were abandoned and in an advanced state of disrepair. The petitions prayed for a transfer of ownership from Cahalan to the City under Iowa Code section 657A.10A (2014). The district court dismissed the petitions, concluding the transfer of ownership of the properties to the City without just compensation to Cahalan would constitute an unconstitutional taking. On appeal, the City contends the district court erred in failing to transfer ownership of the properties to it in furtherance of a lawful exercise of its police power authorized by the statute. Cahalan urges affirmance of the district court's decision, contending the transfer of titles to the properties to the City under section 657A.10A without just compensation would constitute an unconstitutional per se taking under the standard set forth in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). Because we find the City's claim fits within the public-nuisance exception recognized in *Lucas*, we conclude section 657A.10A does not result in a

taking requiring compensation to Cahalan. We therefore reverse and remand for further proceedings.

## I. Background Facts and Proceedings.

In recent years, small communities across Iowa have seen an increase in the number of unoccupied, dilapidated, and run-down properties. These types of buildings not only detract from the communities' aesthetic appeal and cause concern about the effect on the value of neighboring properties but can also constitute a danger to the public health, safety, or welfare. It is difficult for these communities to address this problem effectively because of the increased proliferation of such properties and the proportionally increased cost of abatement.

Upon determining there were numerous abandoned, dangerous, dilapidated, and blighted buildings within its city limits, the City of Eagle Grove undertook a project to clean up and eliminate them. In August 2014, the City passed Resolution 2014-25, approving an agreement between the City and the Eagle Grove Community Development Corporation (CDC). Under the agreement, the City agreed to allocate up to $250,000 for the project and the CDC was tasked with acquiring, repairing, rehabilitating, or demolishing certain problematic properties identified by either the City or the CDC.

Two of the properties deemed problematic by the City are located at 107 North Blaine Street (Blaine Street property) and 823 South Commercial Street (Commercial Street property). Cahalan Investments, LLC owns both properties.[1] The City chose the two properties for inclusion in

the project because they were dilapidated, had been unoccupied and lacked water service for several years, and were the subject of multiple complaints made by others.

**A. The Blaine Street Property.** Cahalan purchased the Blaine Street property for $7000 on May 21, 2002, and the property has remained unoccupied since that time. Kevin Cahalan started remodeling the property shortly after purchasing it but discontinued the work over ten years ago. It has not been connected to water service since 2002.

On September 14, 2014, a construction inspector hired by the City inspected the property and the exterior of the building on the property, and concluded it was unsafe for entry or occupation. The inspector based his conclusion on missing siding, a rotting roof, and broken windows exposing the building's interior to the elements; a sagging addition on the west side of the house; several holes allowing vermin—such as squirrels and raccoons—to enter; multiple boarded up windows; and some garbage and debris in the yard. A neighbor told the inspector that the house was home for a family of raccoons. Employees of a group home in the neighborhood observed skunks, squirrels, and birds entering the house.

On October 2, 2014, the City sent Cahalan a "Notice to Abate Nuisance" for the Blaine Street property. The notice—given to Cahalan under chapter 145 of Eagle Grove's municipal code—described the property as "a public nuisance that is a menace to the public health, welfare and/or safety by reason of inadequate maintenance, dilapidation, obsolescence, manifestly unsafe, or abandonment." It notified

---

1. The record reveals Cahalan owns other rental properties in Eagle Grove that were not targeted for inclusion in the project. At least one other property owned by Cahalan was initially included in the project, but Cahalan rehabilitated it and it is not a subject of this litigation. Cahalan's only members are Kevin and Rachel Cahalan.

Cahalan the nuisance must be abated through either rehabilitation or removal of the building within fourteen days, and if Cahalan failed to do so, the City would eliminate the nuisance and assess the costs to Cahalan.

On October 31, 2014, the CDC sent Cahalan an offer of $2000 to purchase the Blaine Street property for the purpose of demolishing it. The City made the nominal offer in an attempt to avoid the expense of litigation and to expedite the elimination of the nuisance. On November 12, 2014, Cahalan counteroffered to sell the property for $15,000. The City did not respond to Cahalan's counteroffer.

**B. The Commercial Street Property.** Cahalan purchased the Commercial Street property for $23,000 on December 13, 2011, and the property has remained unoccupied since that time. The property has no functioning toilet or sink. The furnace in the house has not been operated since Cahalan acquired the property. Only part of the house is connected to electrical service.

On September 9, 2014, the City sent Cahalan a "Notice to Abate Nuisance" under chapter 145 of the municipal code. Like the notice sent regarding the Blaine Street property, this notice described the property as a public nuisance, gave Cahalan fourteen days to abate the nuisance through either rehabilitation or removal of the building, and informed Cahalan that if it failed to abate the nuisance the City would take steps to do so and assess the costs to the owner.

On September 14, 2014, the same construction inspector who inspected the Blaine Street property inspected the Commercial Street property. The inspector noted a portion of the roof had collapsed, causing severe water damage to the interior of the building; mold was observed; some of the windows were broken and boarded up; the foundation was broken or crumbling in places; there were many access points for vermin to enter the building; and there was garbage and debris in the backyard. The inspector concluded this property was also unsafe for entry or occupation.

On October 31, 2014, the CDC sent Cahalan a nominal offer of $2000 to purchase the Commercial Street property for the purposes of demolishing it and avoiding litigation. On November 12, 2014, Cahalan counteroffered to sell the property for $20,000, but the City did not respond.

**C. Subsequent Proceedings.** On December 1, 2014, the Eagle Grove City Council held a hearing to determine whether the two properties were public nuisances in violation of chapter 145 of the municipal code. Kevin Cahalan attended the hearing, but he did not present evidence tending to prove the properties complied with the municipal code. He offered no plan for correcting the properties' structural deficiencies. Instead, he requested the City grant him more time to rehabilitate the two structures. The council rejected his request for additional time and decided to continue forward with the process it had commenced under chapter 145 of the municipal code.

Nevertheless, believing the problem of dilapidated and dangerous buildings was an "epidemic" in the community and concluding Eagle Grove was not in the business of rehabilitating such properties, the City chose a different course of action in late December 2014. The City filed petitions in equity against Cahalan under Iowa Code section 657A.10A, seeking an award of title to the two properties.[2] Cahalan

---

**2.** The property taxes for both properties were

delinquent when the petitions were filed in

resisted the City's petitions, contending the acquisition of the properties under section 657A.10A would violate due process and constitute a taking without just compensation in violation of the Fifth Amendment to the United States Constitution and article I, sections 9 and 18 of the Iowa Constitution.

On November 17, 2015, in preparation for trial, the construction inspector hired by the City completed a supplemental inspection of the interior of the Blaine Street property and concluded the property remained dangerous and uninhabitable. The inspector noted the inside of the house was under heavy construction and was "basically gutted"; there were no sanitary toilet facilities; the water lines in the basement were not hooked up and were unusable in the rest of the house; one side of the addition on the west side of the house was not properly tied into the house, allowing vermin to enter, water damage, and decay in the interior; the original basement walls and retaining walls were bowed in; and several stair steps were missing.

A consolidated trial commenced on December 2, 2015. At trial, Kevin Cahalan testified he had no intention of making either property habitable in the foreseeable future. Cahalan offered expert testimony that the buildings were not "structurally unsafe or in danger of collapsing or otherwise harming anyone." The City claimed it had no public use for the properties and that it filed the petitions in furtherance of its efforts to rehabilitate

residential areas by removing abandoned and dilapidated structures within the city. After removing the structures, it was the City's intent to sell the lots if possible.[3]

Both sides offered evidence as to the properties' values. Relying on the Wright County assessor's assessed valuations, Cahalan opined the value of the Blaine Street property is $15,700 ($5400 for the land and $10,300 for the dwelling) and the Commercial Street property is worth $20,900 ($8900 for the land and $12,000 for the dwelling). In the alternative, Kevin Cahalan testified the Blaine Street property is worth at least $10,000 because he agreed to sell it on contract to a third party for that amount shortly after the petitions were filed in this case.

The City presented evidence tending to prove the assessed valuations of the properties do not represent their actual value. In particular, the assessed valuations are based on a presumption that the properties were habitable. Because the properties in question were clearly uninhabitable and in an advanced state of deterioration and disrepair, the City urged the district court to find the assessed valuations are not probative of their actual value.

The record includes expert testimony on the cost of rendering the properties habitable. The construction inspector estimated it would cost $15,000 to $20,000 to make the Blaine Street property habitable. He further estimated it would cost $25,000 to

this case. *See* Iowa Code § 657A.10A(3)(*a*) (indicating property-tax delinquency at the time petition is filed is a factor in determining abandonment). Accordingly, the county treasurer was named as a defendant in the petition. *See id.* § 657A.10A(1)(*a*). Cahalan brought the taxes current prior to trial, however, and the treasurer was dismissed.

3. The record reveals the City has taken title to ten other abandoned properties during the

pendency of the project. After the City took title to those properties, it offered them for sale at a public hearing. The CDC offered to buy the properties for $1 each. The record does not indicate any other offers were ever made. Consequently, the CDC gained title to the properties. It demolished the abandoned buildings on eight of the properties and rehabilitated the two remaining properties.

$30,000 to render the Commercial Street property habitable. After considering the cost of rehabilitation and the postrehabilitation market value of the property, the bank holding a mortgage on the Commercial Street property concluded the project would not be a prudent investment.

Because the City intended to demolish the existing structures on both properties, the expected costs of demolition were also presented at trial. A contractor hired by the City estimated the cost of demolishing the Blaine Street property would be $10,999. The contractor further testified that the cost of demolishing the Commercial Street property would be $12,117.[4]

The parties filed posttrial briefs addressing Cahalan's claim that the award of title to the City would result in an unconstitutional taking. Although the district court found both properties were abandoned under the criteria set forth in section 657A.10A(3), it dismissed the City's petitions. The court concluded the relief requested by the City would deny Cahalan all use of its properties and result in a taking without just compensation. The court also found the properties had more than nominal value, although it did not determine the fair market value of either.

The City appealed and we retained the appeal. On appeal the City claims the district court erred in dismissing its petitions because the actions brought under section 657A.10A are a valid exercise of police power for which no compensation is owed to Cahalan. Conversely, Cahalan claims the relief sought by the City would constitute a per se taking for which compensation is required under the *Lucas* standard.

## II. Scope and Standard of Review.

■ Our review of cases tried in equity is de novo. Iowa R. App. P. 6.907; *City of*

*Waterloo v. Bainbridge*, 749 N.W.2d 245, 247 (Iowa 2008); *see* Iowa Code § 657A.10A(1)(*b*) (requiring actions under section 657A.10A be in equity). Nevertheless, we give weight to the factual findings of the district court, especially with respect to determinations of witness credibility. *Green v. Wilderness Ridge, L.L.C.*, 777 N.W.2d 699, 702 (Iowa 2010).

■ "We review constitutional challenges to a statute de novo." *State v. Thompson*, 836 N.W.2d 470, 483 (Iowa 2013) (quoting *State v. Seering*, 701 N.W.2d 655, 661 (Iowa 2005)); *see Rolfe State Bank v. Gunderson*, 794 N.W.2d 561, 564 (Iowa 2011) ("To the extent constitutional issues are raised [with respect to an issue of statutory interpretation], review is de novo.").

## III. Analysis.

**A. Iowa Code Section 657A.10A.** Iowa Code section 657A.10A allows "a city in which an abandoned building is located [to] petition the court to enter judgment awarding title to the abandoned property to the city." Iowa Code § 657A.10A(1)(*a*). Section 657A.10A(3) enumerates factors the court must consider in deciding whether a property is abandoned:

*a.* Whether any property taxes or special assessments on the property were delinquent at the time the petition was filed.

*b.* Whether any utilities are currently being provided to the property.

*c.* Whether the building is unoccupied by the owner or lessees or licensees of the owner.

*d.* Whether the building meets the city's housing code for being fit for human habitation, occupancy, or use.

---

4. The contractor noted that his estimates of the cost of demolishing the two properties did not include an additional $750 per hour for asbestos testing.

e. Whether the building is exposed to the elements such that deterioration of the building is occurring.

f. Whether the building is boarded up.

g. Past efforts to rehabilitate the building and grounds.

h. The presence of vermin, accumulation of debris, and uncut vegetation.

i. The effort expended by the petitioning city to maintain the building and grounds.

j. Past and current compliance with orders of the local housing official.

k. Any other evidence the court deems relevant.

*Id.* § 657A.10A(3).[5] If the court finds the property is abandoned, "the court shall enter judgment awarding title to the city."[6] *Id.* § 657A.10A(5). An award of title pursuant to section 657A.10A(5) "shall be free and clear of any claims, liens, or encumbrances." *Id.*

Section 657A.10A became effective May 17, 2004. 2004 Iowa Acts ch. 1165, §§ 10, 11. As we noted in *Bainbridge,*

> [p]rior to the enactment of section 657A.10A, the city could petition the court to appoint a receiver to take possession and control of a building considered to be a public nuisance. The receiver would then be able to manage the property and take the necessary steps to

abate the nuisance and bring the building into compliance with housing and building regulations and ordinances.

749 N.W.2d at 248 (citing Iowa Code §§ 657A.4, .6). Section 657A.10A was enacted in 2004 to give municipal governments an alternative means of abating the public nuisance caused by abandoned buildings. *Id.* ("The legislature enacted section 657A.10A to give the city an opportunity to obtain title to the property rather than have a receiver appointed to manage the property."); *accord* S.F. 2291, 80th G.A., 2d Sess. Explanation (as introduced to Iowa Senate, Mar. 17, 2004); Legislative Servs. Agency, Iowa G.A., *2004 Summary of Legislation: Regular and Extraordinary Sessions* 144–45 (2004), https://www.legis.iowa.gov/docs/publications/SOL/401772.pdf#SF2291 [https://web.archive.org/web/20170325195422/https://www.legis.iowa.gov/docs/publications/SOL/401772.pdf].

 **B. Cahalan's Takings Challenge and the Relevant Constitutional Framework.** On appeal, Cahalan claims section 657A.10A is an unconstitutional taking under the Fifth Amendment of the United States Constitution and article I, section 18 of the Iowa Constitution. When reviewing a constitutional challenge to a statute,

---

**5.** The legislature amended subsection 3, effective July 1, 2015, to also allow the court to consider the following:

> Whether the building is boarded up or otherwise secured from unauthorized entry.
>
> ... Past and current compliance with orders of the local housing or building code official.
>
> ....
>
> ... Whether the building meets the city's building code as being fit for occupancy or use.
>
> ... Whether those claiming an interest in the property have, prior to the filing of the

petition, demonstrated a good-faith effort to restore the property to productive use.

2015 Iowa Acts ch. 136, §§ 51–52, 55 (retroactively effective to July 1, 2015).

**6.** The court is also required to award title to the city if the city establishes

> all parties with an interest in the property have received proper notice and either consented to the entry of an order awarding title to the property to the city or did not make a good faith effort to comply with the order of the local housing official within sixty days after the filing of the petition.

Iowa Code § 657A.10A(4).

we must remember that statutes are cloaked with a presumption of constitutionality. The challenger bears a heavy burden, because it must prove the unconstitutionality beyond a reasonable doubt. Moreover, "the challenger must refute every reasonable basis upon which the statute could be found to be constitutional." Furthermore, if the statute is capable of being construed in more than one manner, one of which is constitutional, we must adopt that construction.

*State v. Hernandez-Lopez,* 639 N.W.2d 226, 233 (Iowa 2002) (citations omitted) (quoting *State v. Keene,* 629 N.W.2d 360, 364 (Iowa 2001)); *accord Thompson,* 836 N.W.2d at 483.

The Fifth Amendment prohibits the taking of private property for public use without just compensation.[7] U.S. Const. amend. V. Similarly, article I, section 18 provides in pertinent part,

> [p]rivate property shall not be taken for public use without just compensation first being made, or secured to be made to the owner thereof, as soon as the damages shall be assessed by a jury, who shall not take into consideration any advantages that may result to said owner on account of the improvement for which it is taken.

Iowa Const. art. I, § 18. Because Cahalan does not contend the takings standard under the Iowa Constitution is different than the Federal Constitution's takings standard, we "apply the established federal standards regarding takings, but reserve the right to apply these standards in a fashion different than the federal courts." *Brakke v. Iowa Dep't of Nat. Res.,* 897 N.W.2d 522, 542 (Iowa 2017).

■ To determine whether a statute gives rise to an unconstitutional taking, we apply a well-established analytical framework:

> (1) Is there a constitutionally protected private property interest at stake? (2) Has this private property interest been "taken" by the government for public use? and (3) If the protected property interest has been taken, has just compensation been paid to the owner?

*Kingsway Cathedral v. Iowa Dep't of Transp.,* 711 N.W.2d 6, 9 (Iowa 2006) (quoting *Bormann v. Bd. of Supervisors,* 584 N.W.2d 309, 315 (Iowa 1998) (en banc)).

■ *1. Constitutionally protected private property right.* In order for there to be a taking requiring compensation, there must be a constitutionally protected private property right. *See id.* State law defines what constitutes a property right. *Id.*; *accord Lucas,* 505 U.S. at 1030, 112 S.Ct. at 2901; *Texaco, Inc. v. Short,* 454 U.S. 516, 525, 102 S.Ct. 781, 790, 70 L.Ed.2d 738 (1982). We have defined property in this context to mean "the group of rights inhering in the citizens' relation to the physical thing, as the right to possess, use and dispose of it." *Kingsway Cathe-*

---

7. The Fifth Amendment provides,

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; *nor shall private property be taken for public use, without just compensation.*

U.S. Const. amend. V (emphasis added). The Fifth Amendment's Takings Clause is made applicable to the states through the Fourteenth Amendment. *Lingle v. Chevron U.S.A. Inc.,* 544 U.S. 528, 536, 125 S.Ct. 2074, 2080, 161 L.Ed.2d 876 (2005).

*dral*, 711 N.W.2d at 9 (quoting *Bormann*, 584 N.W.2d at 315). Cahalan claims, and the City does not dispute, that its ownership of the properties in fee simple is the private property interest at stake.

■■■ However, because state law defines "property interest[s] that [are] entitled to constitutional protection, the State has the power to condition the permanent retention of [those] property right[s] on the performance of reasonable conditions that indicate a present intention to retain the interest[s]." *Texaco, Inc.*, 454 U.S. at 526, 102 S.Ct. at 790. Through section 657A.10A, the general assembly has established conditions for retaining one's property interest in buildings or structures. In particular, the conditions are calculated to promote public safety by discouraging owners from abandoning their properties in a deteriorated and dangerous condition as defined by criteria enumerated in section 657A.10A(3). *Cf. id.* at 525–26, 102 S.Ct. at 790 ("The State of Indiana has defined a severed mineral estate as a 'vested property interest,' entitled to 'the same protection as are fee simple titles.' Through its Dormant Mineral Interests Act, however, the State has declared that this property interest is of less than absolute duration; retention is conditioned on the performance of at least one of the actions required by the Act." (Footnote omitted.)).

■■■ The district court found Cahalan abandoned the properties under the standard established in the statute. We agree.

By allowing the properties to persist in a condition unfit for human habitation, allowing the properties to remain vacant, and failing to make timely and reasonable efforts to remedy the public nuisances created by the properties after notification of the problems, Cahalan did not comply with the section 657A.10A(3) criteria. Thus it failed to "indicate a present intention to retain the interest." *See id.* at 526, 102 S.Ct. at 790. We conclude the district court erred in concluding Cahalan holds a constitutionally protected private property interest in the abandoned properties for which just compensation is owed.[8]

■■■ 2. *Whether the property interest has been taken by the government for public use.* We now turn to the question of whether awarding the City title per section 657A.10A would allow the City to take Cahalan's interest in the properties for public use.[9] The quintessential taking is "a 'direct appropriation' of property or the functional equivalent of a 'practical ouster of [the owner's] possession.'" *Lucas*, 505 U.S. at 1014, 112 S.Ct. at 2892 (alteration in original) (first quoting *Legal Tender Cases*, 79 U.S. (12 Wall.) 457, 551, 20 L.Ed. 287 (1871), *abrogated by Penn. Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); and then quoting *Transp. Co. v. Chicago*, 99 U.S. 635, 642, 25 L.Ed. 336 (1878), *abrogated by Penn. Coal Co.*, 260 U.S. 393, 43 S.Ct. 158). We have referred to this type of taking as one where "a governmental entity exercises its eminent domain power or acts in an 'enter-

---

8. Cahalan did not challenge the criteria defining abandonment in section 657A.10A(3) as a violation of its right to substantive due process or as an arbitrary standard for determining its interest in the properties; nor did it raise a procedural due process claim in this case.

9. We acknowledge that our conclusion Cahalan does not have a constitutionally protected private property interest in the abandoned properties is dispositive in this case. Nevertheless, we alternatively address the second prong of the takings analysis—whether the property interest at issue has been *taken* by the government—because both parties limited their briefs and arguments on appeal to that prong.

prise capacity, where it takes unto itself private resources and uses them for the common good.' "[10] *Kingsway Cathedral*, 711 N.W.2d at 9 (quoting *Bormann*, 584 N.W.2d at 317). A classic example of this type of taking is when a private landowner refuses to sell land to the government so the government initiates a condemnation action for the property and pays just compensation. *Id.* at 9–10.

In *Pennsylvania Coal Co.*, the United States Supreme Court first recognized that when the government regulates the use of property, through the exercise of its police power,[11] a taking can occur if that regulation "goes too far." *Penn. Coal Co.*, 260 U.S. at 415, 43 S.Ct. at 160; *accord Lucas*, 505 U.S. at 1014, 112 S.Ct. at 2892–93. This is known as a regulatory taking. *Lucas*, 505 U.S. at 1014–15, 112 S.Ct. at 2892–93; *Brakke*, 897 N.W.2d at 545. There are three[12] types of regulatory takings:

(1) a per se taking arising from a permanent physical invasion of property, (2) a per se taking arising from regulation that denies the owner all economically beneficial ownership, and (3) a regulatory taking based on the balancing of the three *Penn Central [ Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646 (1978),] factors.

*Brakke*, 897 N.W.2d at 545; *accord Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893; *Bormann*, 584 N.W.2d at 316.

Cahalan contends the City's acquisition of title to the properties, and thus full possessory rights, pursuant to section 657A.10A would amount to a per se taking under the standard set forth in *Lucas*—i.e., the second type of regulatory taking noted above. It does not challenge the statute as a governmental exercise of enterprise capacity, a per se taking arising from a permanent physical invasion, or a regulatory taking based on ad hoc balancing of the three *Penn Central* factors.[13]

---

**10.** The power of eminent domain (or the government's ability to act in an enterprise capacity) allows the government to take privately owned property and convert it to public use. *See Hardy v. Grant Twp. Trs.*, 357 N.W.2d 623, 625 (Iowa 1984). *See generally* 26 Am. Jur. 2d *Eminent Domain* §§ 1–3, 5–6, Westlaw (database updated Nov. 2017). This power is inherent in every sovereign state as an attribute of sovereignty. *Clarke Cty. Reservoir Comm'n v. Robins Revocable Tr.*, 862 N.W.2d 166, 171 (Iowa 2015); *accord* 26 Am. Jur. 2d *Eminent Domain* § 3. Its existence does not depend on a specific grant of power in a constitution or statute, although constitutional provisions can limit the exercise of the right. *E.g., Boom Co. v. Patterson*, 98 U.S. 403, 406, 25 L.Ed. 206 (1878); 26 Am. Jur. 2d *Eminent Domain* §§ 3, 6. The power of eminent domain lies dormant until the legislature delegates it by express authorization. *See Hardy*, 357 N.W.2d at 625; 26 Am. Jur. 2d *Eminent Domain* § 5.

**11.** "Police power refers to the legislature's broad, inherent power to pass laws that promote the public health, safety, and welfare." *Gacke v. Pork Xtra, L.L.C.*, 684 N.W.2d 168,

177 (Iowa 2004) (quoting *Gravert v. Nebergall*, 539 N.W.2d 184, 186 (Iowa 1995)).

**12.** Sometimes authorities combine the first two types of regulatory takings quoted above and refer to them collectively as "per se" takings. *E.g., Lingle*, 544 U.S. at 538, 125 S.Ct. at 2081. Additionally, these three types of takings are sometimes referred to as "physical occupations," "categorical takings," and "noncategorical takings," respectively. *E.g.,* 26 Am. Jur. 2d *Eminent Domain* §§ 10–13. Alternatively, sometimes only the last two types of regulatory takings quoted above are categorized as "regulatory takings." *E.g., Cebe Farms, Inc. v. United States*, 116 Fed.Cl. 179, 194–95 (2014); 26 Am. Jur. 2d *Eminent Domain* §§ 10–13.

**13.** The three *Penn Central* factors are (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Cent.*, 438 U.S. at 124, 98 S.Ct. at 2659; *accord Brakke*, 897 N.W.2d at 543.

Therefore, we limit our analysis to whether an award of title pursuant to section 657A.10A effectuates a taking by denying Cahalan all economically beneficial use of the properties.

In *Lucas*, the Court held a regulation that denies the property owner "all economically beneficial or productive use" amounts to a per se taking. 505 U.S. at 1015, 112 S.Ct. at 2893. The Court emphasized there must be a *complete* economic deprivation from the landowner's point of view for the situation to qualify as a per se regulatory taking. *Id.* at 1017, 1019 & n.8, 112 S.Ct. at 2894, 2895 & n.8 (noting if a landowner's deprivation is not complete, "[s]uch an owner might not be able to claim the benefit of our categorical formulation"). The Court reasoned, "from a landowner's point of view, being totally deprived of all of the beneficial use of the land is the equivalent of a physical appropriation." *Brakke*, 897 N.W.2d at 546 (citing *Lucas*, 505 U.S. at 1017, 112 S.Ct. at 2894).

There is no dispute that an award of title to the City under section 657A.10A would deny Cahalan "all economically beneficial or productive use" of the properties. *Lucas*, 505 U.S. at 1015, 112 S.Ct. at 2893. However, *Lucas* explained that proof of a denial of all economic or productive use alone will not entitle the owner to compensation under the Constitution. *Id.* at 1027, 112 S.Ct. at 2899. "[W]here it can be shown that the property owner's 'bundle of rights' never included the right to use the land in the way the regulation forbids," the regulation at issue may deny the owner all economically beneficial or productive use of the land without requiring just compensation. *Hunziker v. State*, 519 N.W.2d 367, 370 (Iowa 1994);[14] *accord Lucas*, 505 U.S. at

---

**14.** We note that part of *Hunziker* is no longer good law because of subsequent United States Supreme Court caselaw. In *Lucas*, the Supreme Court stated "the Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or denies an owner economically viable use of his land.'" 505 U.S. at 1016, 112 S.Ct. at 2894 (emphasis omitted) (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). In *Hunziker*, we relied on that rule from *Lucas* in noting, under the Federal and Iowa Constitutions, the government is not required to pay compensation if the land-use regulation "substantially advances a legitimate state interest" or—under limited circumstances—"denies the owner all economically beneficial or productive use of the land." 519 N.W.2d at 370 (citing *Lucas*, 505 U.S. at 1024, 112 S.Ct. at 2897). While our analysis in *Hunziker* focused on the "limited denial of beneficial or productive use" alternative, we also noted the plaintiffs conceded the state action at issue was not a regulatory taking requiring compensation because it satisfied the "substantially advances" alternative. *Id.* at 371.

After our decision in *Hunziker*, the Supreme Court held the "substantially advances" alternative "is not a valid method of identifying regulatory takings for which the Fifth Amendment requires just compensation." *Lingle*, 544 U.S. at 545, 125 S.Ct. at 2085. The Court's holding in *Lingle* abrogated the rule from *Lucas* that we relied on in formulating the rule under the Iowa Constitution in *Hunziker*. The *Lingle* holding also expanded the Fifth Amendment protections given to private property owners against regulatory takings because the state could no longer resist payment of compensation by showing the state action substantially advanced a legitimate state interest. Because the Iowa Constitution cannot limit the protections afforded in the Federal Constitution, the Iowa Constitution cannot allow the state to avoid paying compensation because the state action at issue substantially advanced a legitimate state interest. *See, e.g.,* U.S. Const. art. VI, cl. 2 (supremacy clause); *Kelo v. City of New London*, 545 U.S. 469, 489, 125 S.Ct. 2655, 2668, 162 L.Ed.2d 439 (2005) (noting states can impose more limitations on their ability to take property than the Federal Constitution provides); *Reynolds v. Sims*, 377 U.S. 533, 584, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506 (1964) (holding a state action can violate the Federal Constitution even if that state action is in compliance with state

1027, 112 S.Ct. at 2899; *Iowa Coal Mining Co. v. Monroe County*, 494 N.W.2d 664, 670 (Iowa 1993); *City of Monroe v. Nicol*, 898 N.W.2d 899, 903 (Iowa Ct. App. 2017). "Whether or not the property owner's 'bundle of rights' included the right to use the land in the way the regulation forbids is to be determined under state nuisance and property law." *Hunziker*, 519 N.W.2d at 370 (citing *Lucas*, 505 U.S. at 1029, 112 S.Ct. at 2900).

In *Hunziker*, the plaintiffs were land developers, and one of their lots contained a Native American burial mound. *Id.* at 368. Under Iowa Code section 305A.9 (1991), a state archaeologist established a buffer zone around the burial mound, which made it unfeasible to build a house on that lot. *Id.* After the city refused to issue a building permit, the plaintiffs filed suit contending section 305A.9 allowed state regulatory action to deny them all economically beneficial or productive use of the lot, which required just compensation. *Id.* at 370.

We rejected the plaintiffs' claim. *Id.* at 371. We noted the Code sections at issue— sections 305A.7, 305A.9, and 715.5(2)— were all in existence and part of Iowa's property law at least ten years before the plaintiffs bought the land. *Id.* Therefore, "at the time the plaintiffs acquired title, the State, under existing state law, could have prevented disinterment." *Id.* Because "[t]his limitation or restriction on the use

of the land inhered in the plaintiffs' title," there was no taking requiring just compensation. *Id.*

Similarly, in *Nicol*, the court of appeals addressed whether section 657A.10A effectuates a taking for which compensation is required. 898 N.W.2d at 902. The court noted "even in the event of a complete taking, the State is not required to compensate a property owner if it 'can show that the owner's "bundle of rights" never included the right to use the land in the way the regulation forbids.' " *Id.* at 903 (quoting *Iowa Coal Mining Co. v. Monroe County*, 555 N.W.2d 418, 431 (Iowa 1996) (citing *Lucas*, 505 U.S. at 1027, 112 S.Ct. at 2899)). The court concluded section 657A.10A merely provides an alternative consequence to behavior that was already prohibited, and it therefore does "no more than duplicate the result that could have been achieved in the courts ... by the State under its complementary power to abate nuisances that affect the public generally, or otherwise." *Id.* (quoting *Lucas*, 505 U.S. at 1029, 112 S.Ct. at 2900). As such, compensation was not required. *Id.*

Here, section 657A.10A became effective on May 17, 2004. 2004 Iowa Acts ch. 1165, § 11 (making Act effective upon enactment). The version of section 657A.10A in effect when Cahalan purchased the Commercial Street property on December 13, 2011, was very similar to the initially enacted version.[15] *Compare* Iowa Code

---

constitutional provisions). Thus, the "substantially advances" portion of the rule from *Hunziker* is no longer good law and cannot be used as an independent basis to resist paying compensation. Nevertheless, because our reference to *Hunziker* in this case is based on *Hunziker*'s analysis of the "limited denial of beneficial or productive use" exception, any abrogative effect on *Hunziker* from *Lingle* does not affect our analysis.

**15.** Between May 17, 2004 (date of initial enactment) and December 13, 2011 (date when

the Commercial Street property was purchased), section 657A.10A was amended once to add what is now subsection 6 (addressing circumstance in which abandoned property has been sold on tax sale to holder of tax sale certificate), and the following language currently found in subsection 1(*a*): "A petition filed under this section shall include the legal description of the abandoned property." 2010 Iowa Acts ch. 1050, §§ 11–12 (codified at Iowa Code § 657A.10A (2011)). Neither of these amendments substantially affects whether Cahalan would have been "on no-

§ 657A.10A (2011), *with* Iowa Code § 657A.10A (2004). Thus, like in *Hunziker*, under state law existing at the time Cahalan acquired title to the Commercial Street property, the City could have petitioned for an award of title if Cahalan allowed the property to fall into an "abandoned" state. *See* 519 N.W.2d at 371. Therefore,

> [b]ecause the statute does "no more than duplicate the result that could have been achieved in the courts . . . by the State under its complementary power to abate nuisances that affect the public generally, or otherwise," [a taking under section 657A.10A] is not a constitutional taking for which compensation is required.

*Nicol*, 898 N.W.2d at 903 (quoting *Lucas*, 505 U.S. at 1029, 112 S.Ct. at 2900).

In contrast, when Cahalan purchased the Blaine Street property on May 22, 2002, section 657A.10A had not yet been enacted. Nevertheless, pursuant to *Lucas*, if at the time Cahalan acquired title, allowing the property to fall into an "abandoned" state was otherwise unlawful under state law and could be remedied by the transfer of title, the duplicative result under section 657A.10A does not entitle Cahalan to just compensation. *See* 505 U.S. at 1029–30, 112 S.Ct. at 2900–01; *see also Freeman v. Grain Processing Corp.*, 895 N.W.2d 105, 120 (Iowa 2017) ("The nuisance statute does not supersede common law nuisance.").

When Cahalan acquired title to the Blaine Street property on May 22, 2002, Iowa statutes allowed for the abatement of public nuisances by transfer of title. For example, the government could abate a nuisance by forfeiture under chapter 809A, which requires transfer of title. Iowa Code ch. 809A (2001). More specifically, under section 657.3,

> tice" that allowing its property to fall into an "abandoned" state could result in title being awarded to the City.

[w]hoever is convicted of erecting, causing, or continuing a public or common nuisance as provided in this chapter, or at common law when the same has not been modified or repealed by statute, where no other punishment therefor is specially provided, shall be guilty of an aggravated misdemeanor and the court may order · such nuisance abated, and issue a warrant as hereinafter provided.

Iowa Code § 657.3. Chapter 657 defines nuisance as "[w]hatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to unreasonably interfere with the comfortable enjoyment of life or property." *Id.* § 657.1 (currently § 657.1(1)). At common law, a public nuisance is established through proof of three basic elements: "(1) unlawful or antisocial conduct that (2) in some way injures (3) a substantial number of people." *State ex rel. Turner v. Younker Bros., Inc.*, 210 N.W.2d 550, 564 (Iowa 1973) (en banc) (quoting Note, *Usury and the Time-Price Exception*, 1971 Wis. L. Rev. 296, 309).

If—prior to the passage of section 657A.10A—a court determined a property constituted a public nuisance under chapter 657 or at common law, the party responsible for that nuisance could have been found guilty of a public offense under section 657.3. Accordingly, because a violation of section 657.3 is an aggravated misdemeanor, the conduct constituting the violation could have given rise to a forfeiture even before the adoption of section 657A.10A. *Id.* § 809A.3(1) (currently § 809A.3(1)(*a*)) (providing "[a]n act or omission which is a public offense and which is a serious or aggravated misdemeanor or felony" may give rise to a for-

feiture). When property is subject to forfeiture, "[t]itle to the forfeited property interest and its proceeds shall be deemed to have vested in the state on the commission of the conduct giving rise to the forfeiture under this chapter." *Id.* § 809A.16(4) (same in current Code); *see Bennis v. Michigan,* 516 U.S. 442, 443, 452, 453, 116 S.Ct. 994, 996, 1001, 134 L.Ed.2d 68 (1996) (holding forfeiture of car used to engage in an unlawful sex act with a prostitute did not constitute a taking requiring compensation).

Therefore, at the time Cahalan acquired title to the Blaine Street property, under existing general nuisance and property forfeiture law, it could have lost title to the Blaine Street property if it allowed the property to become and persist as a public nuisance. Thus, the transfer of the title to the Blaine Street property under section 657A.10A "do[es] no more than duplicate the result that could have been achieved in the courts ... by the State under its complementary power to abate nuisances that affect the public generally." *Lucas,* 505 U.S. at 1029, 112 S.Ct. at 2900. Consequently, under the circumstances of this case, the transfers of the titles to the City under section 657A.10A (2014) would not constitute a taking for which compensation is required. *See id.* at 1030, 112 S.Ct. at 2901.

3. *Whether just compensation has been paid for any taking of a constitutionally protected private property right.* Because we conclude the transfer of titles to the two properties under section 657A.10A would not constitute a taking under the circumstances presented here, there is no constitutional requirement of just compensation.

### IV. Disposition.

The district court erred in concluding the transfer of titles to the abandoned properties to the City under section 657A.10A would constitute an unconstitutional taking without just compensation under the Fifth Amendment to the United States Constitution or under article I, section 18 of the Iowa Constitution. Accordingly, we reverse the dismissal of the City's petitions and remand for entry of an order consistent with this opinion.

**REVERSED AND REMANDED.**