Leonard T. Strand, Chief Judge
I. INTRODUCTION
This case is before me on a motion (Doc. No. 23) for summary judgment by defendant *1007 City of Sibley, Iowa (Sibley). Plaintiffs ChemSol, LLC (ChemSol), and Iowa Drying & Processing, LLC (IDP), have filed a resistance (Doc. No. 30), and Sibley has filed a reply (Doc. No. 40). Oral argument is not necessary. See N.D. Iowa L.R. 7(c).
II. PROCEDURAL BACKGROUND
Plaintiffs commenced this case by filing a complaint (Doc. No. 1) on February 16, 2018. The complaint asserts three claims for relief under 42 U.S.C. § 1983 and Iowa law, all arising from Sibley's enactment and enforcement of an odor ordinance:
Count I: Violation of Due Process (facial and as-applied challenge)
Count II: Inverse Condemnation
Count III: Tortious Interference with Expected Business Advantage
Doc. No. 1. Plaintiffs seek compensatory damages, as well as declaratory and injunctive relief. Id. at 15.
Sibley answered and discovery commenced. Sibley filed the present motion for summary judgment on March 14, 2019. Plaintiffs filed their resistance on April 4, 2019. This matter is currently scheduled for a jury trial beginning August 26, 2019.
III. SUMMARY JUDGMENT STANDARDS
Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
A material fact is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, "the substantive law will identify which facts are material." Id. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. Id. "An issue of material fact is genuine if it has a real basis in the record," Hartnagel v. Norman , 953 F.2d 394, 395 (8th Cir. 1992) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ), or "when 'a reasonable jury could return a verdict for the nonmoving party' on the question," Woods v. DaimlerChrysler Corp. , 409 F.3d 984, 990 (8th Cir. 2005) (quoting Anderson , 477 U.S. at 248, 106 S.Ct. 2505 ). Evidence that only provides "some metaphysical doubt as to the material facts," Matsushita , 475 U.S. at 586, 106 S.Ct. 1348, or evidence that is "merely colorable" or "not significantly probative," Anderson , 477 U.S. at 249-50, 106 S.Ct. 2505, does not make an issue of material fact genuine. Put another way, "[e]vidence, not contentions, avoids summary judgment." Reasonover v. St. Louis Cnty. , 447 F.3d 569, 578 (8th Cir. 2006) (citation omitted). The parties "may not merely point to unsupported self-serving allegations." Anda v. Wickes Furniture Co. , 517 F.3d 526, 531 (8th Cir. 2008).
As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson , 477 U.S. at 249, 106 S.Ct. 2505 (quotations omitted). The party moving for entry of summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."
*1008 Hartnagel , 953 F.2d at 395 (citing Celotex , 477 U.S. at 323, 106 S.Ct. 2548 ). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. Mosley v. City of Northwoods , 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. Id. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. Celotex , 477 U.S. at 322, 106 S.Ct. 2548.
To determine whether a genuine issue of material fact exists, I must view the evidence in the light most favorable to the nonmoving party. Matsushita , 475 U.S. at 587-88, 106 S.Ct. 1348. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. Id. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." Kammueller v. Loomis, Fargo & Co. , 383 F.3d 779, 784 (8th Cir. 2004) (citing Quick v. Donaldson Co. , 90 F.3d 1372, 1376-77 (8th Cir. 1996) ). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." Quick , 90 F.3d at 1377.
IV. RELEVANT FACTS
Unless otherwise noted, the following facts are undisputed:
A. The Parties
ChemSol is a Minnesota limited liability company that owned a drying facility located at 1020 4th Avenue, Sibley, Iowa (the Facility), from November 2012 until transferring it to IDP in April 2017. Doc. No. 1 at ¶ 7. IDP is a Minnesota limited liability company that was formed to operate the Facility. Before 2012, the Facility was used for milk drying and storage. Doc. No. 23-6 at 9. In April 2017, IDP acquired the Facility from ChemSol pursuant to a warranty deed. Id. at 8, 23. IDP also owns the equipment at the Facility. Id. at 23. IDP uses the Facility to dry biological liquids such as plasma protein, porcine peptone and gelatin into powders for other applications - such as dog food - by spraying the liquids through nozzles into a heated chamber. Id. at 22.
IDP owes money to ChemSol for the purchase of the Facility, but ChemSol does not have an ownership interest in IDP.[1] However, ChemSol, IDP and several related companies share executive employees. John Bowlsby is the President of ChemSol and the Vice President of IDP. Id. at 45. Larry Zilverberg is the Vice President of ChemSol, and the President of IDP. Doc. No. 30-2 at 109. James Reidy is the Chief Financial Officer (CFO) for ChemSol and IDP, as well as the CFO for Transport U.S.A., LLC, Pro Roasting Solutions, and Hemotech, Inc. Doc. No. 23-6 at 21. These entities have various business relationships with each other. For example, IDP processes product that is owned and ultimately sold by Hemotech. Id. at 22.
Sibley is an Iowa municipal corporation located in Osceola County, Iowa. Doc. No. 1 at ¶ 9. Jerry Johnson is the mayor of Sibley while Larry Pedley, Jan Henningsen, *1009 Tim Nobles, Gail Buchholtz and Mike Groote currently serve on the City Council.[2] Glenn Anderson is the City Administrator. Doc. No. 23-6 at 59; Doc. No. 30-2 at 94. The law firm of DeKoter, Thole, Dawson & Rockman, PLC, and specifically Harold Dawson, represents Sibley as the City Attorney.[3]
B. The Odor Ordinance
Two versions of Sibley's nuisance ordinance are at issue in this case.[4] The November 2013 version prohibited "[t]he creation or maintenance of a nuisance," and defined nuisance to include "offensive smells":
The erecting, continuing or using of any building or other place for the exercise of any trade, employment or manufacture which, by occasioning noxious exhalations, offensive smells or other annoyances, becomes injurious and dangerous to the health, comfort or property of individuals or the public.
Doc. No. 23-3 at 7.
In December 2015, the odor ordinance was amended to increase the civil penalty for municipal violations from $ 100 per offense to $ 750 for a "first offense," and $ 1,000 for repeated violations.[5] Doc. No. 23-2 at 7, Doc. No. 30-1 at 60-61. On June 27, 2016, Sibley amended the odor ordinance to add the words "unreasonably" and "unreasonable." Specifically, the June 2016 version states:
"[N]uisance" shall mean whatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere unreasonably with the comfortable enjoyment of life or property.
* * *
Offensive Smells: The erecting, continuing or using of any building or other place for the exercise of any trade, employment or manufacture which, by occasioning unreasonably noxious exhalations, unreasonably offensive smells or other unreasonable annoyances, becomes injurious and dangerous to the health, comfort or property of individuals or the public.
Doc. No. 23-2 at 15 (emphasis added). This amendment brought the odor ordinance in line with the Iowa Code's definition of nuisance. See Iowa Code §§ 657.1(1) (nuisance defined), 657.2(1) (odor as a nuisance).[6] Finally, if "the authorized municipal *1010 representative finds that a nuisance exists, and that the appropriate method of abatement is reasonably ascertainable from the circumstances," the ordinance provides procedures for abatement including notice and the right to a public hearing. Doc. No. 23-2 at 17.
C. The Conflict
Before ChemSol purchased the Facility and IDP began drying product, the companies had dealings with the Sibley City Council and with the Osceola County Economic Development Commission (OCEDC).[7] ChemSol applied for economic development grants from the United States Department of Agriculture (USDA) and from the OCEDC. The OCEDC approved plaintiffs' applications for an Economic Development grant. Doc. No. 30-1 at 26-27. Ultimately, however, ChemSol states that it purchased the facility using its own funds and returned the grant due to issues with the OCEDC's "increasing demands ... after receiving the funds." Doc. No. 30-2 at 67
Once the Facility began drying products, IDP's operations made Sibley stink. The odor has been described as rotten eggs, dried blood, rotten animal carcasses (boiling, burning and decomposing), vomit, human waste and dead bodies. Residents report that the smell makes them gag or throw up and that it limits the amount of time that they can stand to be outside. Depending on the weather, the odor can be detected all over town. Doc. No. 23-4 at 89-100; Doc. No. 23-5 at 1-100.
Plaintiffs contend that they disclosed that the Facility would create unpleasant odors before IDP commenced operations. In support of this, plaintiffs point to (1) the description of IDP's proposed operations included in the OCEDC grant application, (2) Zilverberg's recollection of his conversations with City Council members and (3) Bowlsby's recollection of his conversations with City Council members. However, the summary judgment record does not clearly establish what information Sibley was given before IDP began operating at the facility. The OCEDC grant application describes the products that would be dried at the facility but does not describe any odors that would result. See Doc. No. 30-1 at 34. Zilverberg recalls telling Kirk Grau[8] at the OCEDC that "[IDP's] products are going to have odors," but Zilverberg did not have a conversation regarding those odors with Sibley's city council. Doc. No. 30-2 at 55. Bowlsby testified that he attended a city council meeting and explained that "the plant will produce odor ... we do what we can to make sure that it's not overly offensive, but there is odor to it." Id. at 62.
Nobles was unable to attend that meeting but had a phone conversation with Bowlsby afterwards to follow up on the odor issues. Nobles testified to his recollection of the conversation as follows:
Q. How did that conversation go?
A. It was good. I mean, he was pleasant. I told him some concerns that I have, which kind of gets to why we're here.
*1011 I - I said one thing that I'm not hearing a lot of questions about that I have a concern about is, what's the smell going to be if you're burning a biological product? I said I grew up in Sioux Falls, South Dakota - I didn't grow up in Sioux Falls, South Dakota; I went to college in Sioux Falls, South Dakota.... And I said every night you'd go out for a walk and you could smell John Morrell's.
Q. John who?
A. John Morrell's. It was a meatpacking plant there.... And he said, "Well, I - I'm familiar with that smell." I don't know if he said he'd been there or not, but there was some familiarity there.
And he said, "I can tell you there will be a little bit of smell, but it will be nothing like that."
Q. Nothing like?
A. John Morrell's.
Q. Okay.
A. Which kind of put me at ease hearing him say that, because it was - I mean it was really bad. And Morrell's was on the north side of town and we were kind of in the heart of town several miles away.
Q. So, I'm sorry. I don't mean to interrupt, but ... the smell from John Morrell's?
A. Would cover the city at night. Because that's when they would render the product, if you will, the by-products.
Q. And that smell was pretty bad?
A. Yes.... I - I only say that just to say why I was describing that to Mr. Bowlsby; that I was concerned that if that was what was going to be going on, that there would be issues.
Id. at 99-100.
IDP began drying products at the Facility in 2012. According to Zilverberg, IDP dried peptones, which generated significant odor complaints. Doc. No. 30-2 at 55 ("And so one of the first few weeks we were in business, we were doing peptones.... [U]sually, it takes a little time to get your process fine tuned. And everything didn't go perfectly. But there's some odors got out into the community, and everybody just freaked out. And you know what? The odors were, they were definitely probably not pleasant to everybody."). Zilverberg does not recall Sibley taking any official action in response to the odors in 2012, but states that IDP did discontinue drying the peptones in Sibley for a time to prevent more odors. Id.
IDP did not receive any odor citations from 2012 to 2016. However, Johnson emailed Buchholtz and copied Anderson regarding odor complaints on December 12, 2014. The email references a conversation between Johnson and the current Facility general manager Dave Erspames:
I told him the smell is a lot better [than] in the past but it has been smelling the last couple of days. He said he would check it out. I also told him when the smell was really bad the City Council was thinking about getting in the pockets of the company because we just can't afford to have that smell in town. I wanted him to have that in the back of his min[d]. He also said give him a call when it smells in town ....
Doc. No. 30-1 at 57. Other than this email, there is no contemporaneous record of any conversation between Sibley and the plaintiffs, and no evidence that Sibley took any official action against the Facility in 2014.
Email correspondence between Reidy and the City Council in June 2015 indicated *1012 that IDP had changed its procedures regarding the intake of product to prevent product derogation (and therefore bad odors), and that it was consulting an expert regarding the installation of equipment to mask odors. Doc. No. 23-6 at 17-18. Reidy committed to having the equipment "in place and operational by July 15." Id. at 18. It is not clear from the materials provided what the referenced "equipment" consisted of, or whether this equipment was actually installed by July 15, 2015. Finally, there is nothing in the record to indicate whether this conversation was prompted by any official action on Sibley's part, volunteered by IDP, or merely in response to community complaints.
On December 15, 2015, Harold Dawson sent an email to plaintiffs' counsel regarding "the City Council of the City of Sibley's position with respect to ongoing concerns and nuisance complaints involving the Iowa Drying and Processing plant here in Sibley." Doc. No. 30-1 at 60. Dawson states:
The City Council feels that it is very important to provide Iowa Drying and Processing with a strict timeline for correcting the continuing nuisance problems. In this regard, the City Council has instructed me to advise you as follows:
The Iowa Drying and Processing plant needs to be properly managed by February 1, 2016, and scrubbers need to be installed and operational no later than April 1, 2016.
If the foregoing matters are not addressed and in place by the foregoing deadlines, the City will file a nuisance action in the Iowa District Court for Osceola County requesting that the Court abate said nuisance.
Also, as indicated to you yesterday, the City Council amended its municipal infraction ordinance at last night's meeting to provide for civil penalties of $ 750.00 for a first violation and $ 1,000.00 for any subsequent violations of the City Ordinance. In the event that Iowa Drying and Processing is in violation of any City Ordinance, including its nuisance ordinance, a municipal infraction citation will be issued by the City.
I appreciate your attention to the foregoing and trust that Iowa Drying and Processing will do everything possible to comply with the requests of the City Council and the City Ordinances.
Id. at 60-61. Other than the email attachments indicating the amended ordinance, there are no contemporaneous records in the summary judgment appendix describing what happened at the December 2015 City Council Meeting.[9]
*1013 In 2016, IDP began receiving odor citations. Chief Sheriffs' Deputy Kevin Wollmuth testified during an abatement proceeding (discussed further below) regarding the process of issuing citations:
When the City Council approached me - our office about starting to write citations because of the offensive smells, the first thing that came to my mind was what's offensive. You know, being offensive is a matter of opinion sometimes so we decided, we're not gonna do anything on them if it's just one phone call, two phone calls. We wanted multiple phone calls before we'd go out and issue citations. And that's exactly what we did. We put the number at three and so each time we received more than three or more complaints, that's when we'd go out and write the citations. Before we went and wrote the citations, myself or whatever deputy is working - you would go out around town. You'd go out and smell and we determined that if it was an offensive odor, three people thought it was offensive, and the deputy or myself thought it was offensive, then we went and wrote the citation. After writing the citation, we would just take down the current weather conditions, temperature, wind direction, wind speed, things like that ... if you couldn't be outside, it was offensive.
Doc. No. 23-4 at 71-72. During his deposition, Wollmuth added that at times there would be offensive odors coming from outside of the city limits. Doc. No. 23-6 at 52. He would not issue citations under Sibley's ordinance in those cases because the city ordinance did not apply outside of city limits. Id. The three-complaint rule was specific to IDP. For different odors (such as smoke) Wollmuth may have investigated after only one complaint. Id. at 52. The three-complaint rule was established by County Deputies, City Administrator Glenn Anderson and the City Attorney. Id. at 52-53.
IDP received four citations in January 2016, seven in February 2016 and five in March 2016. Doc. No. 23-3 at 40-56. IDP did not appear in court on March 21 or March 28, 2016, to contest any of the citations, and was assessed a fine of $ 750 for the first citation and $ 1,000 for each subsequent citation.[10] Id. at 82-100, Doc. No. 23-4 at 1-19. There is no evidence in the summary judgment record as to whether the fines were paid.
In addition to the civil citations, Sibley served a notice of abatement on plaintiffs on February 23, 2016. Doc. No. 23-3 at 35-39. The abatement notice described the "acts necessary to abate nuisance" as follows:
[T]he closing of the Iowa Drying and Processing facility located in Sibley, Iowa or the installation of necessary equipment and procedures that are verifiable and approved by independent engineer to be selected by the City of Sibley and paid for by Iowa Drying and Processing and/or ChemSol that will provide the City of Sibley with full assurance that the nuisance will not continue upon the further operation of the [Facility].
Id. at 38. The Notice required that the nuisance be abated within 30 days, and *1014 informed plaintiffs of the right to a hearing. Id.
On March 11, 2016, at 10:31 a.m., Reidy emailed Nobles discussing the timing of processing certain materials at the Facility and the installation of wet scrubbers:
As a sign of our commitment to finding a solution to the odor problem in the community, we have cancelled next week's production of the product that is causing the odor. While we are still obligated to complete production of work-in-progress, we will suspend production this weekend so the residents of Sibley can enjoy the warm weather that is forecasted. We will resume production on Sunday night at 11 pm and run until the product that is at the facility is all dried, which should be sometime on Tuesday.
If the city council will grant IDP permission to proceed with the installation of the wet scrubber, and suspend its legal action against us, we will delay further production of this product until the last week of April. We will spend the next five weeks installing the wet scrubber so that it is in place by then.
Timing is of the essence, so please let me know if this plan of action is acceptable to the council.
Doc. No. 30-1 at 73-74. Later that day, Dan DeKoter, acting as City Attorney, sent an email to plaintiffs' counsel in follow-up to an apparent phone call between plaintiffs' counsel and DeKoter. DeKoter wrote:
Detail and concreteness will be very important. The commitment for certain dates of processing the offensive product is a good start. The type of scrubber (specs?) the dollars to be committed to it, the dates of installation and testing protocol would be of interest. Thinking out loud, perhaps hiring a neutral engineer to evaluate? My understanding is that Stanton is building a scrubber for a small unit in the plant, but is unable to do the larger dryer. So there needs to be some discussion of how to address that issue following any testing of the scrubber on the smaller unit. I found the attached online and perhaps an estimate from a company like this one, experienced in the field, would be helpful as a sign of good faith for moving forward on the larger unit and any others installed in the future.
A related issue is that Stanton needs to actually be paid. We don't represent them, but I know there are mechanic's liens filed and local contractors unpaid. That doesn't help the public mood. Having this work done but not paying for it will create more public relations problems that no one needs. Cash up front to Stanton would be advisable. They are trustworthy and will do the work spec[ifie]d. This is a small town and the payment issue goes to trustworthiness. For any plan to work people need to be convinced that the company is trustworthy.
As I said, the LaMarca and Landry law firm in Des Moines is seeking clients for a nuisance action. I understand that they are signing up businesses and individuals rather than doing a class lawsuit. Damages in such an action largely disappear if the problem is solved. We represent some private clients, and will need to discuss any plans with them also. They are independent of the city, but have all expressed their willingness to walk away if the problem is solved. They are not wanting protracted litigation with a pot of gold at the end of the rainbow. These are business people who want all businesses to thrive, including IDP. We have deliberately avoided trying to expand the group of people we represent, because we do not want people involved who are unwilling to walk *1015 away upon abatement. Our interest is in abating the nuisance.
I mentioned personal liability not as a threat but as a point to note. Tort liability is not shielded by corporations. Individual actors still have liability. Nuisances are torts under Iowa law, and your clients need to be aware of that. Again, we have a common interest in solving the problem rather than creating exposure to damages.
Id. at 72-73.
The abatement hearing was held on March 28, 2016. Doc. No. 23-4 at 20. Attorney Scott Carlson appeared on behalf of IDP. He explained that IDP was "happy to hire an engineer to try and find a resolution" but that the lack of "measurable standards" and guidance from the city prevented it from investing to abate the nuisance. Doc. No. 23-4 at 26-27. Reidy also read a statement during the hearing. Among other things, Reidy described some of the steps IDP took prior to March 28, 2016:
1. IDP "ordered a thorough review of our receiving and storage protocols ... to make sure our product did not degrade."
2. IDP purchased deodorizers for certain products.
3. IDP purchased "wet scrubbers" - "an air pollution control device that removes particular[te] matter or pollutants from the exhaust of the drier." However, the wet scrubber was not installed due to a breakdown in negotiations between Sibley officials and IDP.
4. IDP temporarily stopped processing a particular product that generated a large number of complaints.
Id. at 28-38.
The parties further discussed the installation of wet scrubbers at the abatement hearing. The plan, as described at the hearing, was for IDP to pay an independent engineer to evaluate the effectiveness of installing a wet scrubber on one of the dryers and then to install the wet scrubber as expeditiously as possible. Doc. No. 23-4 at 44-47. The City Council also considered the statements of two Sibley residents and over 100 questionnaires[11] submitted by Sibley residents. See id. at 89-100, Doc. No. 23-5.
After the hearing, Sibley issued a decision determining that the emissions from the IDP plant constituted a nuisance and ordering that the nuisance be abated. Specifically, the City ordered:
1. Iowa Drying and Processing and ChemSol shall deposit funds into an escrow account to be held by the City of Sibley in the amount of $ 50,000.00. The funds shall be used to retain and pay an engineer of the City's choosing to study the plant's operations and make recommendations and be used reasonably to abate any future nuisances. Iowa Drying and Processing and ChemSol shall deposit the required funds with the City of Sibley on or before April 11, 2016.
2. Iowa Drying and Processing and ChemSol shall promptly and consistently permit the retained engineer, upon his or her request, to conduct *1016 and record interviews of employees, conduct testing, take samples, install monitoring equipment, inspect and photograph the facility, have access to and the right to copy records of the product that is processed by the facility, the amounts of the products processed by the facility, and dates any and all such products were processed by the facility since it started operation and to do any other procedures that in the judgment of the engineer are reasonable and necessary to the task. The engineer will be required to make recommendations as to the procedures that are reasonably necessary to eliminate any future odor in the processing of any products by the facility.
3. Following the report from the engineer, the City will schedule an additional hearing at which time it will receive the report into evidence and receive any response to the report from Iowa Drying and Processing and ChemSol. Following that hearing the City will determine what further orders to enter based on the evidence presented.
4. The City retains jurisdiction of this matter pending the engineer's work. Failure of Iowa Drying and Processing and ChemSol to follow the terms of this order will result in further legal action by the City.
5. The City Council of the City of Sibley shall review the status of the foregoing requirements at its regularly scheduled City Council meeting on April 11, 2016, to ensure that Iowa Drying and Processing and ChemSol have deposited funds in escrow for the purpose of allowing the City to retain an engineer. If said funds are not deposited by that time, the City Council will consider what further actions may be necessary to ensure that the nuisance as described herein is abated.
6. Furthermore, the City Council of the City of Sibley shall review the status of the foregoing requirements at its regularly scheduled City Council meeting on May 9, 2016, to ensure that Iowa Drying and Processing and ChemSol is complying with all of the foregoing requirements. If said actions are not being taken by Iowa Drying and Processing and ChemSol to follow the recommendations of the engineer, the City Council will consider such further actions deemed necessary to ensure the abatement of said nuisance.
Doc. No. 23-4 at 87-88.
After the March 28, 2016, abatement hearing, plaintiffs continued receiving odor citations. Plaintiffs received 20 citations in 2016 (one in April, six in June, seven in August, five in September and two in October), four citations in 2017 and one citation in 2018. Doc. No. 23-3 at 57-81. As before, Plaintiffs were fined $ 1000 per occurrence. Plaintiffs did not appeal the abatement order issued by the City Council. There is again no evidence as to payment of the fines.
Despite the discussion surrounding the installation of wet scrubbers during the abatement hearing, the scrubbers were never installed. Zilverberg testified that IDP had tested a wet scrubber that "worked," but IDP did not continue to the process of having the scrubber approved by Sibley's engineer and IDP did not have the funds to complete the process. Doc. No. 30-2 at 58. Reidy testified that IDP did have the funds to complete the process and that in early 2016 it submitted plans for the installation of the wet scrubber to *1017 the Iowa Department of Natural Resources. Id. at 72-74.
Nobles testified that the wet scrubber was not installed due to a communication breakdown. Specifically, Sibley wanted to ensure that the wet scrubber would give the community relief:
Well, do you know what it's going to smell like after you put a wet scrubber on there? I don't either. So am I going to tell the public - or tell the company more importantly, that you can put a wet scrubber in and everything's fine? I can't make that assurance to you, because I don't have the expertise to know that.
And that's why I think we had to have other engineers that specialize in that area involved to give - you know, you want to know anything about any stock out there? I will tell you it and I will figure out the answer for you. But I am not an engineer that can deal with containing odors. So it wasn't fair for me to assure the company that this wouldn't be a problem any longer if I have no idea what I'm talking about.
* * *
Our engagement with IDP in trying to find a solution was all revolving around trying to have outside experts, that were neutral, help determine what would - what would control it and be the best solution for the city and the company.
There was - there was a feeling that if IDP just took it upon themselves to say they were doing things, that they wouldn't do it. Or they wouldn't do it - they would do it on the cheap.
Id. at 104.
Regardless of whether the wet scrubbers would have reduced the odor, it appears that IDP chose to reduce odors by drying less products. IDP contends that it had to turn away profitable business in 2015 and 2016 due to concerns that the products it had the opportunity to process would cause odor problems. Doc. No. 23-6 at 25. IDP has attempted to sell the Facility. IDP states that it is unable to do so as a result of the bad publicity surrounding the Facility. Id. at 29-30. IDP contends that someone working for Sibley scared off potential buyers by stating that Sibley would do anything to get rid of IDP.
Additional facts may be discussed below.
V. DISCUSSION
Sibley argues that it is entitled to summary judgment as to all counts because the undisputed facts show that Sibley did not violate plaintiffs' constitutional rights and that the tortious interference count fails under Iowa law. Sibley also argues that ChemSol should be dismissed for lack of standing. Plaintiffs generally resists. I will address each of Sibley's arguments.
A. ChemSol's Standing
Sibley argues that ChemSol lacks standing in this case because there is no evidence that ChemSol has any ownership interest in IDP or that ChemSol has suffered damages as a result of Sibley's actions. ChemSol contends that it has standing.
The doctrine of standing ensures that courts hear only "those disputes which are appropriately resolved through the judicial process." Lujan v. Defenders of Wildlife , 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citation omitted). As the Supreme Court explained:
[T]he irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent....' Second, there must be a *1018 causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.
Id. at 560-61, 112 S.Ct. 2130 (cleaned up); see also City of Clarkson Valley v. Mineta , 495 F.3d 567, 569 (8th Cir. 2007). Because we have reached the "summary judgment" stage of litigation, ChemSol is not entitled to rely on the pleadings alone and must produce evidence in support of its standing.
ChemSol's argument that it has standing is as follows:
ChemSol transferred ownership of the facility to IDP in April 2017, in exchange for a note in the approximate amount of $ 1,100,000. (Defendant Undisputed Facts para. 10). ChemSol also is responsible for the original letter of credit that secures the USDA loan on the purchase of the Sibley facility in the amount of [sic. ]
ChemSol has paid over $ 40,000 in fines pursuant to citations issued enforcing an unconstitutionally vague ordinance, not mention [sic] an old ordinance that had been amended. Sibley's actions have affected IDP's business operations which, in turn, effect IDP's ability to pay ChemSol.
Doc. No. 30 at 38. Other than the fact that ChemSol sold the facility to IDP, none of the above facts have any basis in the summary judgment record. Indeed, the record contradicts ChemSol's argument. Bowlsby, ChemSol's President, was entirely unable to explain ChemSol's involvement in this lawsuit:
Q: Now, so sitting here today, does ChemSol own any property that's in dispute in this lawsuit?
A: I am not sure. I do not know.
Q: Okay. Is ChemSol claiming that ChemSol has lost profits as a result of the conduct of the City of Sibley?
A: ChemSol has not filed any suits concerning that.
Q: You understand ChemSol is a plaintiff in this lawsuit, right?
A: I guess that's true.
Doc. No. 23-6 at 48.
It is undisputed that IDP and ChemSol are separate entities. IDP's inability to pay any obligations it may have to ChemSol are insufficient as a matter of law to confer standing. Warth v. Seldin , 422 U.S. 490, 499-500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally."). All of the evidence in the record regarding lost profits pertains to IDP. However, ChemSol was named as a defendant in many of the citations issued by Sibley (Doc. No. 23-3 at 58-81) and in the abatement action (Id. at 30).
At this point in the proceedings, it is inappropriate to rely on unsupported allegations to determine whether ChemSol has standing. Based on the evidence in the summary judgment record, I find that ChemSol has standing to challenge the nuisance ordinance (Count I) as it was named as a defendant in the citations. However, there is no record evidence to support that ChemSol was harmed by a *1019 "taking" (Count II) or that it has lost business opportunities or profits as a result of Sibley's alleged interference with IDP's drying business or its attempts to sell the property (Count III). Sibley's motion to dismiss ChemSol due to lack of standing will be granted as to Counts II and III.
B. Due Process Violation
Count I alleges that Sibley's odor ordinance violates the Procedural Due Process Clause of the Fifth and Fourteenth Amendment of the United States Constitution because it (1) is void for vagueness on its face, and (2) is applied in an arbitrary and/or discriminatory manner against the plaintiffs. Doc. No. 1 at ¶¶ 41-51. Plaintiffs contend that the ordinance is unconstitutional because it:
fails to prescribe a standard to property owners notifying them of what is required to avoid violation under the Odor Ordinance. Instead, the Odor Ordinance makes creating "noxious exhalations, offensive smells or other annoyances" unlawful, which is inherently dependent on the subjective vagaries of the olfactory sensitivities of Sibley law enforcement and the public.
Doc. No. 1 at ¶ 45.
The Eighth Circuit Court of Appeals has explained the standards governing void-for-vagueness challenges:
"The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." D.C. and M.S. v. City of St. Louis, Mo. , 795 F.2d 652, 653 (8th Cir.1986). A vague regulation is constitutionally infirm in two significant respects. First, the doctrine of vagueness "incorporates notions of fair notice or warning," Smith v. Goguen , 415 U.S. 566, 572, 94 S.Ct. 1242 [39 L.Ed.2d 605] (1974), and a regulation "violates the first essential of due process of law" by failing to provide adequate notice of prohibited conduct. Connally v. General Constr. Co. , 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). In short, a regulation is void-for-vagueness if it "forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." Id. Second, the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement. Smith , 415 U.S. at 573, 94 S.Ct. 1242. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis ...." Grayned v. City of Rockford , 408 U.S. 104, 108-09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).
Stephenson v. Davenport Cmty. Sch. Dist. , 110 F.3d 1303, 1308 (8th Cir. 1997) (cleaned up). To determine whether an ordinance is unconstitutionally vague, courts rely on "the common usage of statutory language, judicial explanations of its meaning, and previous applications of the statute to the same or similar conduct. D.C. and M.S. , 795 F.2d at 654 (internal quotations omitted).
1. Facial Challenge
The Supreme Court has established a high bar for facial challenges to statutes that - like the odor ordinance - do not implicate the First Amendment:
Under United States v. Salerno , 481 U.S. 739, 745 [107 S.Ct. 2095, 95 L.Ed.2d 697] (1987), a plaintiff can only succeed in a facial challenge by "establishing that no set of circumstances exists under which the Act would be valid," i.e. , that the law is unconstitutional in all of its applications. While some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge *1020 must fail where the statute has a "plainly legitimate sweep." Washington v. Glucksberg , 521 U.S. 702, 739-740 & n.7 [117 S.Ct. 2258, 138 L.Ed.2d 772] (1997) (Stevens, J., concurring in judgments). In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases. See United States v. Raines , 362 U.S. 17, 22 [80 S.Ct. 519, 4 L.Ed.2d 524] (1960) ("The delicate power of pronouncing an Act of Congress unconstitutional is not to be exercised with reference to hypothetical cases thus imagined." Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." Raines , 362 U.S. at 22 [80 S.Ct. 519].
Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Sari [Sabri] v. United States , 451 [541] U.S. 600, 609 [124 S.Ct. 1941, 158 L.Ed.2d 891] (2004). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." Ashwander v. TVA , 297 U.S. 288, 346-347 [56 S.Ct. 466, 80 L.Ed. 688] (1936) (Brandeis, J., concurring). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." Ayotte v. Planned Parenthood of N. New Eng. , 546 U.S. 320, 329 [126 S.Ct. 961, 163 L.Ed.2d 812] (2006).
Wash. State Grange v. Wash. State Rep. Party , 552 U.S. 442, 449-52, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (cleaned up).
Plaintiffs argue that the odor ordinance is unreasonably vague on its face because the terms "offensive" in the November 2013 version of the ordinance and "unreasonably offensive" in the June 2016 version of the ordinance are subjective - different people may find different smells "offensive." Plaintiffs complain that "offensive" is not defined by the ordinance and that the ordinance does not provide any guidelines as to frequency, duration, or intensity of odor. Plaintiffs argue that other localities - specifically the State of Missouri[12] - have more-clearly defined *1021 odor ordinances and that, by contrast, the Sibley ordinance is too vague. Sibley responds that its ordinance is not unconstitutionally vague because it does nothing more than prohibit odors that are a "public nuisance" - a concept long known to and upheld by the law as within the police power of a state or municipality.
Sibley is correct. The odor ordinance simply prohibits "public nuisances" as that term has long been understood. See Keystone Bituminous Coal Ass'n v. DeBenedictis , 480 U.S. 470, 491-92, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987) ("Long ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." (citing Mugler v. Kansas , 123 U.S. 623, 665, 8 S.Ct. 273, 31 L.Ed. 205 (1887) ). The odor ordinance at issue is nearly identical to Iowa's public nuisance statute. Iowa Code § 657.2(1). Iowa's public nuisance statute is consistent with the traditional definition of public nuisance. See Restatement (Second) of Torts § 821B(1) (Oct. 2018) ("A public nuisance is an unreasonable interference with a right common to the general public"); id. at cmt. b ("[P]ublic nuisances included interference with the public health ... [and] with the public comfort, as in the case of widely disseminated bad odors, dust and smoke .... In each of these instances the interference with the public right was so unreasonable that it was held to constitute a criminal offense."). Iowa's public nuisance statute has not been held to be unconstitutionally vague.[13] On this basis alone, plaintiffs' facial challenge fails. See Wash. State Grange , 552 U.S. at 449, 128 S.Ct. 1184 ("[A] facial challenge must fail where the statute has a plainly legitimate sweep." (internal citations omitted)).
Regardless of the long-standing validity of nuisance ordinances, plaintiffs' contention that "offensive" can be defined subjectively does not make the odor ordinance unreasonably vague. First, plaintiffs' argument focuses on one word in the statute and ignores the remaining context. Plaintiffs repeatedly cite to testimony that many smells are offensive to some number of people but make no argument as to whether those smells (smoke, a hog confinement, citrus) are "injurious or dangerous to the health, comfort or property of individuals or the public," as the ordinance requires. This additional qualification transforms the ordinance from one that could punish any smell to one that prohibits *1022 only public nuisances.[14] Compare City of Festus v. Werner , 656 S.W.2d 286, 287 (Mo. Ct. App. 1983) (ordinance prohibiting "disagreeable or unwholesome smells" without specifying the quantity or quality of odor necessary for a violation was unreasonably vague), with New York v. Monoco Oil Co. , 185 Misc.2d 742, 713 N.Y.S.2d 440, 443-44 (N.Y. 2000) ("[T]here is no objective standard by which one can determine whether something is 'unreasonably odorous.' However, when linked with the language in the ordinance prohibiting the emission of substances that are detrimental to the health, well-being and general safety of the community ... [the ordinance] sets a standard which is essentially the definition of public nuisance."). This qualifying language makes the ordinance sufficiently definite for due process purposes.
Second, as a matter of Iowa law, "offensive" and "unreasonably offensive" in the public nuisance context are defined objectively, not subjectively:
A fact finder uses the normal person standard to determine whether a nuisance involving personal discomfort or annoyance is significant enough to constitute a nuisance. The normal-person standard is an objective standard and is explained in comment d to section 921F of the Restatement (Second) of Torts (1977):
When an invasion involves personal discomfort or annoyance, it is sometimes difficult to determine whether the invasion is significant enough to constitute a nuisance. The standard for the determination of significant character is the standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant. If normal persons in that locality would not be substantially annoyed or disturbed by the situation, then the invasion is not a significant one, even though the idiosyncrasies of the particular plaintiff may make it unendurable to him.
Weinhold , 555 N.W.2d at 459 (cleaned up). Iowa courts have found offensive odors to be a nuisance when credible evidence established that the odor was distinguishable from the smell of a traditional hog operation and "like an open septic tank," Weinhold , 555 N.W.2d at 460, and when odors disrupted life by interrupting business, id. , and by causing irritability, headaches, sleep loss and nausea.
*1023 Patz v. Farmegg Prods., Inc. , 196 N.W.2d 557, 562 (Iowa 1972). Thus, it is entirely possible for a person or entity to know what conduct is prohibited by Sibley's odor ordinance. Sibley is entitled to summary judgment on the facial challenge.
2. As-Applied Challenge
Although the void-for-vagueness analysis is the same in a facial or as-applied challenge, as-applied challenges have a distinct remedy:
"An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." Rep. Party of Minn., Third Cong. Dist. v. Klobuchar , 381 F.3d 785, 790 (8th Cir 2004). "If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." Id. ; see Citizens United v. Fed. Election Comm'n , 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (holding that the distinction between a facial challenge and an as-applied challenge "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint").
Minn. Majority v. Mansky , 708 F.3d 1051, 1059 (8th Cir. 2013). Thus, the odor ordinance is void for vagueness as applied to plaintiffs if the otherwise-constitutional odor ordinance was enforced in an arbitrary or unfair manner.
Plaintiffs argue that the odor ordinance is unconstitutionally vague as applied to them because Sibley arbitrarily enforced the ordinance to target plaintiffs. Plaintiffs complain that other (out-of-town) odor sources were not fined and that Sibley increased the fines specifically to put pressure on plaintiffs. Plaintiffs state that on at least one occasion they were cited while the Facility was not in operation, and they deny that every odor emitted from the Facility rose to the level of a public nuisance. Finally, plaintiffs state that Sibley is estopped from claiming that operation of the Facility creates a public nuisance because Sibley granted IDP permission to operate that Facility. Sibley responds that the out-of-town offensive odors are outside of Sibley's jurisdiction and, in any event, that there is no evidence that these odors are "injurious and dangerous to the health, comfort or property of individuals or the public." Sibley denies that it is estopped from enforcing its odor ordinance and argues that its enforcement techniques are constitutional.
a. Estoppel
Plaintiffs claim that Sibley knew there would be odor from the Facility, induced the construction at the Facility with representations that its use would be permitted, and that plaintiffs relied on those representations in investing in the Facility. As a result, plaintiffs claim that Sibley is estopped from enforcing the odor ordinance against them. Sibley denies that it made any representations that it would not enforce local ordinances. The evidence on this point is mixed. Sibley was informed that there would be some odor but there is no evidence that it was informed of the full extent of the odor. More importantly, there is no evidence in the record that Sibley made any promises to plaintiffs regarding the enforcement of local ordinances.
Under Iowa law, the elements of estoppel are:
(1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promise was seeking an assurance upon which the promise could rely and without which he would not act; (3) the promise acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise.
*1024 Kunde v. Estate of Bowman , 920 N.W.2d 803, 810-11 (Iowa 2018) (citation omitted).
Plaintiffs have submitted no evidence of a "clear and definite promise," relying instead on the unsupported statement that "IDP would not have made significant financial investments to convert the warehouse absent representations by Sibley that the use would be permitted. These representations were given." Doc. No. 30 at 32. In fact, Reidy, Bowlsby and Zilverberg all deny that the City promised to refrain from enforcing its odor ordinance. Doc. No. 26-5 at 36-37; Doc. No. 30-2 at 62; Doc. No. 40-3 at 9. Plaintiffs then shift to arguing that Sibley did not perform due diligence before ChemSol purchased the Plant. Sibley's diligence is not relevant to the issue of whether Sibley made a clear and definite promise to refrain from enforcing the ordinance. In the absence of such a promise, Plaintiffs estoppel argument fails.
b. Arbitrary Enforcement
Turning to the argument that the odor ordinance was arbitrarily enforced, plaintiffs contend that the "tailoring" of the ordinance and the pattern of enforcement against plaintiffs demonstrate an improper enforcement motive. Essentially, plaintiffs appear to be making a "class-of-one" argument,[15] alleging that they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Vill. of Willowbrook v. Olech , 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Plaintiffs further argue that the enforcement mechanisms (the three-complaint rule and the Sheriff's investigation) are too arbitrary and unreliable to be constitutional.
Plaintiffs' apparent class-of-one theory - that they are treated differently from other odor sources - has no merit. The Eighth Circuit has explained the limitations of such a theory:
The class-of-one theory may not apply to
forms of state action ... which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.
Engquist v. Or. Dep't of Agric. , 553 U.S. 591, 602-04, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (illustrating the point with a hypothetical involving a traffic officer - on a busy highway frequented by speeders - exercising the discretion inherent in deciding which vehicle operator to issue a speeding ticket). Applying Engquist's rationale to a "police officer's decisions regarding whom to investigate and how to investigate," we held "that while a police officer's investigative decisions remain subject to traditional class-based equal protection analysis, they may not be attacked in a class-of-one equal protection claim" because investigative decisions "necessarily involve discretion." Flowers v. City of Minneapolis, Minn. , 558 F.3d 794, 799-800 (8th Cir. 2009).
* * *
*1025 The threshold inquiry in the class-of-one equal protection claim is whether plaintiffs are similarly situated to others who allegedly received preferential treatment. Domina v. Van Pelt , 235 F.3d 1091, 1099 (8th Cir. 2000). Absent such a threshold showing, the plaintiffs do not have a viable equal protection claim. Klinger v. Dep't of Corr. , 31 F.3d 727, 731 (8th Cir. 1994). "To be similarly situated for purposes of a class-of-one equal protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all material respects." Reget v. City of La Crosse , 595 F.3d 691, 695 (7th Cir. 2010) ;
"Identifying the disparity in treatment is especially important in class-of-one cases." Barstad v. Murray Cnty. , 420 F.3d 880, 884 (8th Cir. 2005). "A class-of-one plaintiff must therefore provide a specific and detailed account of the nature of the preferred treatment of the favored class, especially when the state actors exercise broad discretion to balance a number of legitimate considerations." Nolan v. Thompson , 521 F.3d 983, 990 (8th Cir. 2008).
Robbins v. Becker , 794 F.3d 988, 995-97 (8th Cir. 2015) (cleaned up).
Plaintiffs do not meet this demanding standard. Although the odor ordinance has been enforced against plaintiffs and not against other Sibley odor sources, plaintiffs have not demonstrated that they are similarly situated to those sources. For example, plaintiffs have presented no evidence that the hog lot outside of town produced odors that were "injurious to the public health, safety or wellbeing of the public." Further, the other odor sources at issue are distinguishable from the Facility because they are located outside of Sibley's city limits (and thus believed by Sibley to be outside of the municipalities' jurisdiction), while the Facility is located within the city. However, even if plaintiffs were similarly situated to the hog lot outside of town (for example), the decision to issue a citation for a condition that violates the law falls within the category of cases excluded from the "class-of-one" analysis by Engquist.
Plaintiffs' argument that the Osceola County Sheriff's enforcement of the odor ordinance was inexact and occasionally erroneous is also insufficient to establish a violation of plaintiffs' due process rights. To the extent that they challenge past enforcement of the odor ordinance, plaintiffs' claims are barred by the state court judgments against them.[16] Exxon Mobil Corp. v. Saudi Basic Indus. Corp. , 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) (The Rooker-Feldman doctrine bars cases "brought by state-court losers complaining of injuries cause by state-court judgments rendered before the district court proceedings commenced.").
As to future enforcement of the odor ordinance, plaintiffs have not established that enforcement violates their due process rights. As discussed above, the ordinance is sufficiently definite to provide adequate notice of what constitutes a public nuisance. Plaintiffs have no right to maintain a public nuisance, and they do not seriously argue that the Facility did not constitute *1026 a public nuisance in the past. In the event a citation is erroneously issued in the future, or Sibley's method of investigation is insufficient to establish the existence of an actual nuisance, plaintiffs are adequately protected by the opportunity to contest the citation in court. Doc. No. 23-2 at 17; see also Iowa Code § 364.22. Sibley is entitled to summary judgment on Count I.
C. Inverse Condemnation
Count II alleges that Sibley's enforcement of the odor ordinance constitutes an unconstitutional taking of private property for public use without just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and article 1, section 18 of the Iowa Constitution. Doc. No. 1 at ¶¶ 52-59. Sibley contends that it is entitled to summary judgment on Count II because its actions do not constitute a taking under federal or Iowa law, and because the federal claim is not ripe. Although Sibley appears to be correct regarding the federal claim, Williamson Cnty. Reg. Planning Comm'n v. Hamilton Bank , 473 U.S. 172, 194-95 & n.13, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), a detailed analysis of that issue is not necessary as IDP's claim is foreclosed by controlling precedent.
1. Federal Takings Claim
"[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Penn. Coal Co. v. Mahon , 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). The Supreme Court has established few definite rules regarding regulatory takings, preferring instead a "factual inquir[y], designed to allow careful examination and weighing of all relevant circumstances." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency , 535 U.S. 302, 322, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002).
The Court has, however, stated two guidelines relevant here for determining when government regulation is so onerous that it constitutes a taking. First, "with certain qualifications ... a regulation which 'denies all economically beneficial or productive use of land will require compensation under the Takings Clause. Second, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.
Murr v. Wisconsin , --- U.S. ----, 137 S.Ct. 1933, 1943, 198 L.Ed.2d 497 (2017). Regarding the "character of the governmental action" prong, the Supreme Court has held that, under some circumstances, property rights yield to the police power of the state. Penn. Coal Co. , 260 U.S. at 413, 43 S.Ct. 158 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.").
The federal regulatory taking doctrine does not apply to state action against public nuisances. See Kelo v. City of New London , 545 U.S. 469, 519-20, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) ("Traditional uses of [state police] power, such as the power to abate a nuisance, required no compensation whatsoever."). "Long ago it was recognized that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community, and the Takings Clause did not transform that *1027 principle to one that requires compensation whenever the State asserts its power to enforce it." Mugler , 123 U.S. at 664, 8 S.Ct. 273 (cleaned up). For example, in Miller v. Schoene , 276 U.S. 272, 280, 48 S.Ct. 246, 72 L.Ed. 568 (1928), the Supreme Court recognized a state's authority to destroy trees to "prevent the spread of disease" as a justified "exercise of its police power to prevent ... impending danger," without compensating the owner. Id. at 280, 48 S.Ct. 246. Similarly, in Keystone , 480 U.S. at 492, 107 S.Ct. 1232, the Supreme Court held that "the public interest in preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." Because the challenged ordinance "plainly [sought] to further" the public interest in preventing nuisances by limiting the removal of coal beneath certain structures, a taking did not occur. Id.
IDC's argument that Sibley's odor ordinance is a regulatory taking depends on a finding that the ordinance is constitutionally invalid. As discussed above, it is not. Thus, Sibley is entitled to summary judgment on the federal takings claim.
2. Iowa Takings Claim
Iowa's constitution also protects from regulatory takings. See Iowa Const. art. I, § 18. For regulatory takings claims brought under the Iowa constitution, Iowa "appl[ies] the established federal standards regarding takings, but reserve[s] the right to apply these standards in a fashion different than the federal courts." Brakke v. Iowa Dep't of Nat. Res. , 897 N.W.2d 522, 542 (Iowa 2017). In considering whether a statute gives rise to an unconstitutional taking, Iowa considers:
(1) Is there a constitutionally protected private property interest at stake?
(2) Has this private property interest been "taken" by the government for public use? and (3) If the protected property interest has been taken, has just compensation been paid to the owner?
Kingsway Cathedral v. Iowa Dep't of Transp. , 711 N.W.2d 6, 9 (Iowa 2006) (internal quotation omitted).
Iowa has not yet considered whether enforcing a nuisance law could constitute a regulatory taking. However, in City of Eagle Grove v. Cahalan Investments, Inc. , 904 N.W.2d 552 (Iowa 2017), the Iowa Supreme Court held that the state's exercise of its related police powers over abandoned property[17] did not constitute a taking. Regarding the "constitutionally protected private property interest" element, the court found:
In order for there to be a taking requiring compensation, there must be a constitutionally protected private property right. State law defines what constitutes a property right. We have defined property in this context to mean "the group of rights inhering in the citizens' relation to the physical thing, as the right to possess, use and dispose of it." Kingsway Cathedral , 711 N.W.2d at 9.
*1028 Cahalan claims, and the City does not dispute, that its ownership of the properties in fee simple is the private property interest at stake.
However, because state law defines property interests that are entitled to constitutional protection, the State has the power to condition the permanent retention of those property rights on the performance of reasonable conditions that indicate a present intention to retain the interests. Through section 657A.10A, the general assembly has established conditions for retaining one's property interest in buildings or structures. In particular, the conditions are calculated to promote public safety by discouraging owners from abandoning their properties in a deteriorated and dangerous condition as defined by criteria enumerated in section 657A.10A(3).
The district court found Cahalan abandoned the properties under the standard established in the statute. We agree. By allowing the properties to persist in a condition unfit for human habitation, allowing the properties to remain vacant, and failing to make timely and reasonable efforts to remedy the public nuisances created by the properties after notification of the problems, Cahalan did not comply with the section 657A.10A(3) criteria. Thus it failed to "indicate a present intention to retain the interest." We conclude the district court erred in concluding Cahalan holds a constitutionally protected private property interest in the abandoned properties for which just compensation is owed.
City of Eagle Grove , 904 N.W.2d at 560-61 (cleaned up).
Like the plaintiff in City of Eagle Grove , IDP owns the Facility and has constitutionally protected property rights in the Facility. However, under state law, IDP does not have the right to maintain a public nuisance. See Iowa Code § 657.1. Actions Sibley takes to abate the nuisance therefore do not interfere with a constitutionally protected property right. This is true even if the City's action would deny the plaintiff "all economically beneficial or productive use" of the property:
Proof of a denial of all economic or productive use alone will not entitle the owner to compensation under the Constitution. Lucas v. S.C. Coastal Council , 505 U.S. 1003, 1027 [112 S.Ct. 2886, 120 L.Ed.2d 798] (1992). "[W]here it can be show that the property owner's 'bundle of rights' never included the right to use the land in the way the regulation forbids," the regulation at issue may deny the owner all economically beneficial or productive use of the land without requiring just compensation. Hunziker v. State , 519 N.W.2d 367, 370 (Iowa 1994) ; accord Lucas , 505 U.S. at 1027, 112 S.Ct. 2886. "Whether or not the property owner's 'bundle of rights' included the right to use the land in the way the regulation forbids is to be determined under state nuisance and property law." Hunziker , 519 N.W.2d at 370.
City of Eagle Grove , 904 N.W.2d at 563-64 (cleaned up).
Of course, Sibley has not denied IDP all economic or productive use of its property, nor has Sibley commenced an action to acquire title to IDP's Facility. But the fact that IDP did not abandon its public nuisance like the plaintiff in City of Eagle Grove does not compel a different result. Sibley is entitled to enforce its public nuisance laws without compensating IDP for its losses stemming from enforcement. As a result, Sibley is entitled to summary judgment on the state takings claim.
D. Tortious Interference with Expected Business Advantage
Count III alleges that Sibley's enactment and enforcement of the odor ordinance *1029 "improperly interfered with IDP's operations and efforts to sell the facility." Doc. No. 1 at ¶¶ 60-64. Specifically, IDP alleges that "the City was aware of IDP's intended and actual operations [and] IDP's attempts to sell its facility," and that it interfered with both IDP's operations and attempts to sell the facility, causing lost profits, by enforcing the nuisance ordinance and by "advis[ing] potential buyers of the IDP Facility that the City would 'do anything' to get IDP out of Sibley and ... level[ing] a barrage of negative comments about IDP at the potential buyer." Doc. No. 1 at ¶¶ 37, 61-64. Sibley denies that enforcing its nuisance ordinance constitutes interference with an expected business advantage and argues that there is no evidence in the summary judgment record to support a finding that it acted to dissuade a third party from purchasing the facility.
"Liability under [a] theory [of interference with expected business advantage] is imposed when a person intentionally and improperly interferes with another's prospective contractual relationships with the sole or primary purpose to injure or destroy the plaintiff." Fin. Mktg. Servs., Inc. v. Hawkeye Bank & Trust , 588 N.W.2d 450, 459 (1999). To succeed on a claim of tortious interference with expected business advantage, the plaintiff must prove:
1. The plaintiff had a prospective contractual relationship with a third person.
2. The defendant knew of the prospective relationship.
3. The defendant intentionally and improperly interfered with the relationship in one or more particulars.
4. The interference caused either the third party not to enter into or to continue the relationship or that the interference prevented the plaintiff from entering into or continuing the relationship.
5. The amount of damage.
Tredrea v. Anesthesia & Analgesia, P.C. , 584 N.W.2d 276, 283 (Iowa 1998). "If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability." Id.
1. The Nuisance Ordinance as Interference
Sibley argues that it is entitled to summary judgment on Count III to the extent it alleges liability for enacting and enforcing the odor ordinance pursuant to Iowa's discretionary function immunity. Iowa law subjects municipalities to suit for certain actions. See Iowa Code § 670.2. However, § 670.4(1)(c) provides that municipalities are immune from:
Any claim based upon an act or omission of an officer or employee of the municipality, exercising due care, in the execution of a statute, ordinance, or regulation whether the statute, ordinance or regulation is valid , or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the municipality or an officer or employee of the municipality, whether or not the discretion is abused.
Iowa Code § 670.4(1)(c) (emphasis added). Thus, enacting an ordinance is among the class of activities this exception is designed to protect. See Bellino Fireworks, Inc. v. City of Ankeny, Iowa , 332 F. Supp. 3d 1071, 1099 (S.D. Iowa 2018). To the extent Count III alleges liability based on enacting the odor ordinance, Sibley is entitled to summary judgment.
Sibley is also entitled to summary judgment to the extent that Count III alleges liability for enforcing the odor ordinance. As discussed above, the ordinance *1030 is a valid exercise of Sibley's police powers, authorized by Iowa law, and constitutionally permissible. The tort of interference with expected business advantage requires that the defendant act "improperly." Sibley did not take any actions with respect to enforcing the ordinance that were not authorized by law. Nor is there evidence that Sibley acted with "the sole or primary purpose to injure or destroy the plaintiff." Fin. Mktg. Servs. , 588 N.W.2d at 459. Sibley is entitled to summary judgment on Count III to the extent that cause of action is based on Sibley's enactment or enforcement of the odor ordinance.
2. Communication with Third Parties as Interference
Sibley argues that it is entitled to summary judgment as to the allegations that it interfered with a prospective buyer of the Facility because IDP has failed to identify any such action that is attributable to the city (beyond enacting and enforcing the odor ordinance). The summary judgment record contains no details as to the alleged "barrage of negative comments about IDP" leveled at a potential buyer. In resisting the motion for summary judgment, IDP focuses solely on Sibley's actions concerning the odor ordinance, not on statements Sibley allegedly made to anyone. See Doc. No. 30 at 36-37 ("Through the legislative process, Sibley, after the fact, attempted to shut Plaintiffs down, it attempted to control Plaintiff's operations...."). By failing to brief this claim in resisting Sibley's motion, I find that IDP has abandoned it. See United States v. Eldeeb , 20 F.3d 841, 843 (8th Cir. 1994) ("a party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue." (citation omitted)). Thus, Sibley is entitled to summary judgment on all claims asserted in Count III.
VI. CONCLUSION
For the foregoing reasons, Sibley's motion (Doc. No. 23) for summary judgment is granted in its entirety. Because this order disposes of all claims, judgment shall enter against plaintiffs and in favor of the defendant and the Clerk of Court shall close this case.
IT IS SO ORDERED.

It is a bit unclear who does own IDP. Plaintiffs' answers to interrogatories indicate that both ChemSol and IDP are owned by two different companies. Doc. No. 23-6 at 85. However, the Chief Financial Officer's testimony was that two individuals - Zilverberg and Bowlsby - own IDP in their own names. Doc. No. 23-6 at 22.

Only the depositions of Johnson, Nobles and Anderson were submitted with the motion for summary judgment.

Sibley employees deposed on this point were uncertain as to whether Harold Dawson was the City Attorney, or whether the firm as a whole provided "City Attorney" services to Sibley. See, e.g. Doc. No. 23-6 at 59. The firm's webpage lists Sibley as one of its municipal clients. See http://www.sibleylaw.com/the-firm.php (accessed May 29, 2019). There are email messages in the record on behalf of Sibley from both Dawson and another attorney at the firm.

Under Iowa law, cities have the "authority to define a nuisance by ordinance and to provide that a violation of its nuisance ordinance is a municipal infraction." City of Iowa City v. Iowa Dist. Court for Johnson Cnty. , 456 N.W.2d 178, 180 (Iowa 1990) (citing Iowa Code § 364.1 ).

This increase in penalty is authorized by Iowa law:
A city shall not provide a civil penalty in excess of seven hundred fifty dollars for the violation of an ordinance which is classified as a municipal infraction or if the infraction is a repeat offense, a civil penalty not to exceed one thousand dollars for each repeat offense.
Iowa Code § 364.3(6).

Notably, before 1995 Iowa's nuisance statute did not include the term "unreasonably." Compare Weinhold v. Wolff , 555 N.W.2d 454, 458-59 (Iowa 1996) (citing earlier version of statute) and Iowa Code § 657.1(1) (current code section).

In 1988, Sibley, along with the cities of Ashton, Harris, Melvin and Ocheydan, Iowa, entered into an Intergovernmental Agreement to form the OCEDC for the purpose of encouraging economic development in the county. Doc. No. 30-1 at 5-25. The member cities contribute to the operating costs of the OCEDC by population share, with Sibley being the greatest contributor as the largest city in Osceola County. Id. OCEDC is not named as a defendant, and is a separate entity from the Sibley city government.

Grau was not deposed. Plaintiffs' counsel notes that he died in 2013. Doc. No. 30 at 9.

Plaintiffs submitted a document labeled "Exhibit 17," with the title "IDP Discussions Continue." This document appears to be a (possible) news article that describes a Sibley city council meeting on "December 14th" (no year) and ongoing discussions between plaintiffs, Sibley and local business owners related to the Facility. Doc. No. 30-1 at 58-59. Although Sibley has not objected to the inclusion of this document, I find it too unreliable to consider in connection with the pending motion for summary judgment. It is not authenticated, either by accompanying affidavit or by reference in any of the attached depositions. Its source, author, and publication date are not identified. It references proceedings at a City Council meeting that one would expect to result in a contemporaneous record; however, neither party has produced such records. "Federal Rule of Evidence 901(a) provides that the requirement of authentication is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.' " Jones v. Nat'l Am. Univ. , 608 F.3d 1039, 1045 (8th Cir. 2010) (quoting Fed. R. Evid. 901(a) ). In the summary judgment context, "documents must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence or a deposition that meets the requirements of Fed. R. Civ. P. 56(e). Documents that which do not meet these requirements cannot be considered." Stuart v. Gen. Motors Corp. , 217 F.3d 621, 635 n.20 (8th Cir. 2000).

Although plaintiffs did not receive daily citations, daily citations would have been authorized by Iowa Code § 364.22(12) ("Each day that a violation occurs or is permitted to exist by the defendant, constitutes a separate offense.").

The questionnaires appear to have been prepared by the Dekoter, Thole & Dawson law firm. It is not clear whether Sibley directed its attorney(s) to prepare these questionnaires in anticipation of litigation. The questionnaires asked residents to note where they lived, what they did for a living, whether they experienced odor coming from the IDP Facility and, if so, to describe the odor. All of the questionnaires were signed "under penalty of perjury."

The Missouri statute provides:
No person may cause, permit, or allow the emission of odorous matter in concentrations and frequencies or for durations that odor can be perceived when one (1) volume of odorous air is diluted with seven (7) volumes of odor-free air for two (2) separate trials not less than fifteen (15) minutes apart within the period of one (1) hour.
10 Mo. C.S.R. 10-6.165. Although this ordinance certainly provides more guidance to enterprises which emit odors than the Sibley ordinance, it does not follow that the Sibley ordinance is unconstitutionally vague. The Constitution does not require ordinances to use mathematical precision in defining prohibited conduct:
The degree of vagueness that the Constitution tolerates - as well as the relative importance of fair notice and fair enforcement - depends in part on the nature of the enactment. Thus, economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process. The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe. And the Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed.
Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc. , 455 U.S. 489, 498-99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

Although the Eighth Circuit does not appear to have directly considered this issue, it has upheld a license revocation ordinance on the grounds that it is consistent with a prohibition on public nuisances. See Jake's Ltd., Inc. v. City of Coates , 284 F.3d 884, 890 (8th Cir. 2002) ("[W]e reject as frivolous the contention that an ordinance authorizing revocation if the licensee is 'a menace to the health, safety, or general welfare of the community' confers unbridled discretion. This is a specific discretion-limiting standard not unlike the definition of a public nuisance long known to the law.").

The inclusion of this language distinguishes the Sibley odor ordinance from the three cases cited in support of plaintiffs' argument. See Doc. No. 30 at 23-25 (discussing Festus , 656 S.W.2d 286 ; City of Milwaukee v. Milbrew , 240 Wis. 527, 3 N.W.2d 386 (1942) ; and Bakery Salvage Co. v. City of Buffalo , 175 A.D.2d 608, 573 N.Y.S.2d 788 (N.Y. App. Div. 1991). Festus is distinguished as described above - the ordinance at issue did not require that the odor be harmful to the public and prohibited all odor regardless of its intensity. Festus , 656 S.W.2d at 287. The Sibley ordinance is significantly narrower than the ordinance in Festus. Like Festus , Bakery Salvage Co. prohibited offensive odors without the requirement that the odors affect the health, well-being and general safety of the public. Bakery Salvage Co. , 175 A.D. 2d at 610, 573 N.Y.S.2d 788 ("The ordinance's imprecise definition of noxious or offensive odors would permit the termination of a business because of the presence of any odor which annoys any person who owns property in the 'impact area[.]' "). Milbrew was decided on the particular facts of the case before it and is not applicable here, on a facial challenge to the validity of an ordinance. See 3 N.W.2d at 392 (invalidating a conviction in the absence of evidence that the odors emanating from a brewery were injurious to the public health and wellbeing, where the brewery was in an industrial zone).

Plaintiffs do not use the words "class-of-one" in their brief, nor do they cite any case law or particular legal theory in support of their "as-applied" challenge to the odor ordinance. Based on their rather unhelpful arguments, I am taking a guess that they are making a "class-of-one" argument.

Plaintiffs briefly argue that issue preclusion does not apply here because the default judgments mean that the prior citations were not "actually ... litigated in the prior litigation." Doc. No. 30 at 38 (citing Hoth v. Iowa Mut. Ins. Co. , 577 N.W.2d 390, 392 (Iowa 1998) ). However, the Rooker-Feldman doctrine is not based on issue preclusion, but rather on principles of comity and respect for the finality of state court judgments. Thus, the fact that plaintiffs did not challenge the citations is relevant to determining the scope of claims that can be brought in this case.

Iowa Code Chapter 657A provides a procedure for cities to acquire the title to abandoned property by petitioning the courts, without compensation to the prior owner. A property is considered abandoned when "a building has remained vacant and has been in violation of the housing code or building code of the city in which the property is located ... for a period of six consecutive months." Iowa Code § 657A.1(1). Abandoned property is a public nuisance if it otherwise meets the general definition of public nuisance - it is a danger to the health and wellbeing of the public. City of Eagle Grove , 904 N.W.2d at 559 (discussing the history of state procedures for "abating the public nuisance caused by abandoned buildings."). Thus, although City of Eagle Grove deals with a separate statutory provision than the one at issue, it is directly analogous to this case.